[No. 29246-3-I. Division One. April 25, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. EDWARD LEON NELSON, *Appellant.*

*Carl Franz Luer* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Pamela K. Mohr, Deputy,* for respondent.

COLEMAN, J. — Edward Leon Nelson appeals the trial court's judgment for his conviction of promoting prostitution in the first degree. Nelson contends that (1) the trial court erroneously admitted a hearsay statement, (2) the evidence was insufficient to establish the corpus delicti of the crime, (3) the trial court failed to enter written findings and conclusions from the suppression hearing and at trial, (4) the record does not support a finding that his custodial statements were made voluntarily, and (5) the trial court failed to find each and every element of promoting prostitution in the first degree. We affirm.

On June 11, 1991, undercover detective Michael Lasnier was driving on Pacific Highway South when he saw Annalee Cahoon walking out of the Spruce Motel parking lot. Lasnier pulled over and Cahoon entered his car. Lasnier stated that he was interested in a "blow job" and offered Cahoon $20. Cahoon responded, "I'm supposed to get at least $30". Negotiations ensued and after an agreement was reached, Lasnier pulled into a parking lot and placed Cahoon under arrest.

Lasnier proceeded to search Cahoon and found a key to room 104 at the Spruce Motel. Lasnier suspected that

Cahoon was working for a pimp and questioned her about that, but she did not give a name for fear that she would be beaten. Lasnier had another officer take Cahoon to the precinct while he and Detective John Kallas went to the Spruce Motel to investigate. The detectives learned that room 104 was registered to Nelson and that he drove a blue Cadillac.

After receiving this information, Lasnier and Kallas went to the precinct to speak with Cahoon. According to Lasnier, Cahoon told him that she was being pimped by a guy named Eddie. She gave a description of Eddie, stated that he drove a blue Cadillac and that she had earned $155 that day working as a prostitute. Lasnier wrote the substance of this conversation down as Cahoon's official statement. Cahoon was subsequently taken before a notary, Karen Gramm, where she signed a "*Smith* affidavit."[1] Karen Gramm witnessed the signature and subscribed the jurat and seal to Cahoon's statement.

After talking with Cahoon, Lasnier, Kallas and another detective, McComber, returned to the Spruce Motel and knocked on the door of room 104. McComber had his gun drawn, and the detectives were blocking any access out of the room. When Nelson answered the door, they asked who he was. Nelson provided identification, and Lasnier proceeded to arrest him. According to Lasnier, he advised Nelson of his *Miranda* rights at the time of arrest. Neither Kallas nor Nelson, however, recalls whether Nelson was advised of his rights at the motel or not.

After the arrest, Lasnier searched Nelson and found $155 in cash. When asked where the money came from, Nelson initially responded that he had cashed a check, but he later explained that it was a birthday gift from his uncle. Nelson also told Lasnier that he did not know anyone named Annalee and that no one was staying in the room with him,

---

[1] Cahoon gave her initial statement on June 11, 1991, the day of her arrest. On June 13, 1991, Cahoon met with Lasnier and Deputy Prosecuting Attorney Robert Knief. During this meeting, Cahoon signed a "*Smith* affidavit", attesting to the truth of the written statement.

although the detective could see makeup on the counter and women's clothing on the floor.

In the squad car, Lasnier asked Nelson a number of questions, to which Nelson responded "yes" by nodding his head up and down. Those questions included: "You make [Annalee] charge $30 for a blow job, don't you?" "You told her to charge at least $50 to $100 for sex." "You told her she had to make at least $300, $400 today, didn't you?"

At the precinct, Lasnier recalls that he readvised Nelson of his rights and that Nelson signed a written waiver of those rights. Nelson recalls, however, that he told the officers that he wanted to exercise his right to remain silent and that he wanted to speak to an attorney. Nelson asserts that he signed the waiver form, believing that his signature indicated that he was exercising his right to remain silent.

By information filed in King County Superior Court on June 14, 1991, Edward Leon Nelson was charged with one count of promoting prostitution in the first degree. Prior to trial, defense counsel moved to suppress Nelson's custodial statements on the basis that he was not advised of his *Miranda* rights and that his request for an attorney had not been honored. The motion was denied, and, in light of Nelson's waiver of a jury trial, the case proceeded to trial before Judge Darrah.

Nelson testified on his own behalf. He denied that he had any knowledge of Cahoon's acts of prostitution, that he had encouraged her to commit an act of prostitution, or that he received any money from Cahoon. As to the events leading to his arrest, Nelson stated that he was staying at the Spruce Motel only because of an argument with his girlfriend. He further stated that he had only known Cahoon for a week and that she had merely come to his room to take a shower and change. According to Nelson, he was on his way out when Cahoon arrived, so he gave her the key to his room.

Cahoon also testified at trial. She stated that she had been prostituting since May 1991, but that Nelson did not know of her activities. As to the events leading to her arrest,

Cahoon stated that she had simply taken a shower in Nelson's hotel room.

Over defense objection, the prosecutor asked Cahoon about her written statement. Cahoon explained that she made the statement, but that she falsely named Nelson as her pimp because his room key was found in her possession. She believed that the detectives would release her if she named a pimp. In particular, Cahoon claimed that the detectives told her that she was going to jail unless she admitted to having a pimp. Cahoon then indicated that the only things that were true in her statement were Nelson's name, her name, the room at the motel, the blue Cadillac, and how much money she earned that day.

The State next called Karen Gramm. Gramm testified as to the process that a witness goes through in signing a "*Smith* affidavit". She stated that her general routine is to ask the witness whether he or she has read the statement attached to the affidavit and, if so, does he or she understand it. Gramm then asks the witness to sign the affidavit in her presence so that she can notarize the signature. Gramm indicated, however, that she does not generally administer an oath or ask the witness to attest to the truthfulness of the statement.

At the conclusion of the trial, the court found Nelson guilty as charged and imposed a standard range sentence. No written findings of fact and conclusions of law were entered. Nelson filed his Notice of Appeal on September 27, 1991. His opening appellate brief was filed on January 14, 1993. On June 21, 1993, the State presented written findings and conclusions to the trial court. Judge Darrah indicated that he would review his notes and enter the appropriate findings of fact and conclusions of law. On June 22, 1993, written findings of fact and conclusions of law were filed. Nelson appeals.

We initially consider whether the trial court abused its discretion in admitting Cahoon's written statement as substantive evidence.

At trial, the State offered, and the court admitted, Cahoon's written statement as substantive evidence pursuant to ER 801(d)(1). Under this rule, prior inconsistent statements by a witness are not hearsay when:

> The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is (i) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding[.]

ER 801(d)(1)(i).

Relying on *State v. Smith*, 97 Wn.2d 856, 651 P.2d 207 (1982), Nelson contends that Cahoon's written statement does not satisfy the requirements of ER 801(d)(1)(i). In particular, Nelson argues that, under the facts of this case, the statement was not voluntarily written by Cahoon, the "*Smith* affidavit" lacked minimal guaranties of truthfulness, and the police station interrogation was not an "other proceeding". We disagree.

In *Smith*, our Supreme Court addressed the scope of the "other proceeding" requirement in ER 801(d)(1)(i). There, Rachael Conlin, an assault victim, was severely beaten in a motel room. While being treated for those injuries at the hospital, Conlin met with a police officer. Conlin identified Nova Smith as her attacker and indicated that she was afraid and did not know what to do. The police officer told her that nothing could be done unless she was willing to testify in court. *Smith*, at 858.

Later that day, Conlin went to the police station and talked with a detective about pressing charges. The detective indicated that if she gave a voluntary sworn statement, criminal action against Smith was likely. Conlin proceeded to write, in her own words, a statement describing the assault and naming Smith as her attacker. Then, before a notary, the detective read Conlin the affidavit and administered an oath. Conlin read the affidavit and oath and signed the affidavit, which was notarized. *Smith*, at 858. After leaving the police station, the police were subsequently called to investigate when Con-

lin ran into her manager's apartment screaming for help after being chased by Smith. *Smith*, at 858.

At trial, Conlin surprisingly testified that Smith was not her attacker or pimp. *Smith*, at 858-59. Conlin admitted that she had made the written statement, but explained that she had done so because of a fight with Smith the night before. *Smith*, at 858-59. The State therefore moved, and the trial court admitted, Conlin's written statement as substantive evidence. *Smith*, at 859.

■ On review, the Supreme Court held that Conlin's prior inconsistent statement was properly admissible as substantive evidence, but declined to establish a bright line rule under ER 801(d)(1)(i). *Smith*, at 861. Rather, the court stated that in determining whether a statement made as a written complaint to investigating officers falls under the "other proceeding" requirement,

> [t]he purposes of the rule and the facts of each case must be analyzed. In determining whether evidence should be admitted, reliability is the key. In many cases, the inconsistent statement is more likely to be true than the testimony at trial as it was made nearer in time to the matter to which it relates and is less likely to be influenced by factors such as fear or forgetfulness.

*Smith*, at 861. The court then indicated the factors to be considered in assessing the reliability of the prior inconsistent statement: (1) whether the witness voluntarily made the statement; (2) whether there were minimal guaranties of truthfulness; (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause;[2] and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement. *Smith*, at 861-63.

Taking these factors into consideration, the court in *Smith* thus found Conlin's written statement reliable, and there-

---

[2]The four methods include: (1) the filing of an information by the prosecutor in superior court; (2) grand jury indictment; (3) inquest proceedings; and (4) filing of a criminal complaint before a magistrate. *Smith*, at 862 (quoting *State v. Jefferson*, 79 Wn.2d 345, 347, 485 P.2d 77 (1971)).

fore admissible, because she "voluntarily wrote the statement herself, swore to it under oath with penalty of perjury before a notary, admitted at trial she had made the statement and gave an inconsistent statement at trial where she was subject to cross examination." *Smith*, at 863.

In this case, the reliability of Cahoon's written statement turns on the first three factors provided in *Smith*.[3] As to the first factor, it is clear that Cahoon voluntarily made the statement to Lasnier. In particular, although Cahoon denied the truth of her written statement at trial, she nevertheless testified that she made the statement, that she went to the prosecutor's office 2 days after the statement was made, and that she told Lasnier and a prosecutor that she did not want to proceed with charges because she was afraid of Nelson,[4] but that she nevertheless voluntarily signed the affidavit.

Nelson's contention that Cahoon was coerced or had a motive to lie in making the statement is not borne out by the record. Specifically, at trial, Cahoon claimed that the police promised to release her and not to press charges so long as she named a pimp. Therefore, in order to placate the officers so that she could go home, Cahoon stated that she falsely named Nelson. The record indicates, however, that subsequent to making the statement, Cahoon was sent to juvenile detention. While in detention, Cahoon spoke to Lasnier in a taped telephone conversation and was quite cooperative. There is no indication from that conversation, or from anywhere else in the record, that Cahoon was upset with the police for not keeping their part of an alleged bargain.

Moreover, at the time the statement was taken, Cahoon was in police custody but had not been charged. Rather, the focus of the police investigation was on Nelson, not on Cahoon. Any motive to lie is therefore much less compelling in this case than if Cahoon had been questioned as a suspect.

---

[3] There is no dispute that Cahoon was subject to cross examination at trial.

[4] Cahoon explained at trial that she was afraid of Nelson because she had lied about him being her pimp.

■ Nelson nevertheless argues that the statement is unreliable because, unlike the witness in *Smith*, Cahoon did not write her own statement. As the State indicates, however, Cahoon testified at trial that she gave the statement and that Lasnier wrote it down. In particular, Cahoon stated:

Q: Ms. Cahoon, let me hand you back what's been marked as State's Exhibit 1, what you identified yesterday as being the statement you gave Detective Lasnier. That's your signature on the bottom?

A: Yeah.

Q: Whose handwriting is that?

A: It's the detective's.

Q: The detective wrote it out?

A: Uh-huh.

Q: Did you tell him what to write?

A: Not everything.

Q: Did he put anything in there that you didn't say?

A: Can I see it? Yes, I did not say anything about meeting — Eddy and me being down in Chinatown.

. . . .

Q: Did you read the statement before you signed it?

A: Yes, I did.

Q: Are those the only things you didn't tell him?

A: Everything else, I made up, yeah.

. . . .

Q: Do you know where the detective came up with meeting Eddy in Chinatown?

A: Well, I just said that prior, but I really —

Q: I'm sorry?

A: I said I might have said it but I don't remember saying it.

Thus, given that Cahoon told Lasnier what to write (with the possible exception of the Chinatown meeting) and that the statement was taken in a noncoercive environment, the mere fact that Cahoon did not write the statement herself does not, by itself, render it unreliable.

■ As to the second factor, Nelson contends that because Gramm did not administer an oath or read the affidavit to Cahoon, Cahoon's signature on the affidavit lacks formal guaranties of truthfulness. As the State correctly contends, however, the form of the "*Smith* affidavit" satisfies the oath requirement of ER 801(d)(1). Specifically, in setting forth the circumstances in which an unsworn form may be treated as a sworn statement, RCW 9A.72.085 provides in pertinent part:

Whenever, under any law of this state or under any rule, order, or requirement made under the law of this state, any matter in an official proceeding is required or permitted to be supported, evidenced, established, or proved by a person's sworn written statement, declaration, verification, certificate, oath, or affidavit, the matter may with like force and effect be supported, evidenced, established, or proved in the official proceeding by an unsworn written statement, declaration, verification, or certificate, which:

(1) Recites that it is certified or declared by the person to be true under penalty of perjury;

(2) Is subscribed by the person;

(3) States the date and place of its execution; and

(4) States that it is so certified or declared under the laws of the state of Washington.

Here, the series of declarations included in the affidavit satisfies each of these listed requirements. The affidavit may therefore be regarded as a sworn statement. The more problematic issue is whether the record is sufficient to find that Cahoon knew that her statement was being taken under the penalty of perjury. We find that it is.

Included in the affidavit is the following declaration: "I have read the attached statement or it has been read to me and I know the contents of the statement." Cahoon was equivocal at trial as to whether she read the affidavit incorporating the statement or not. Other evidence was presented, however, from which a finding could be made that Cahoon understood that her written statement was made under penalty of perjury. In particular, Detective Lasnier testified that during Cahoon's meeting with the prosecutor on June 13, the prosecutor reviewed the statement with Cahoon and explained the import of the affidavit. In addition, Gramm, the notary in this case, testified that although she did not remember Cahoon coming in to sign the affidavit, it is her standard procedure to ask a witness whether he or she has read the affidavit and that she would not execute the affidavit if given a negative response. Thus, based on this evidence, the record is sufficient to find that Cahoon's signature on the affidavit satisfies the required minimal guaranties of truthfulness.

Finally, as to the third factor, Nelson contends that a police interrogation is not an "other proceeding" within the meaning of ER 801(d)(1)(i). We disagree. As in *State v. Smith*, 97 Wn.2d 856, 651 P.2d 207 (1982), Cahoon's statement was taken as standard procedure in a police investigation that resulted in the filing of an information. Absent other indicia of unreliability, our Supreme Court has indicated that this method for determining the existence of probable cause constitutes an "other proceeding".[5] *See Smith*, at 862-63.

Thus, we find that, in light of the factors to be considered under *Smith*, Cahoon's statement was sufficiently reliable and the trial court therefore properly admitted Cahoon's written statement as substantive evidence under ER 801(d)(1)(i).

We next determine whether the evidence was sufficient to establish the corpus delicti of the crime of promoting prostitution in the first degree.

■ ■ Washington law provides that a confession or admission may support a conviction only when the State produces independent evidence sufficient to establish the corpus delicti of the crime charged. *State v. Smith*, 115 Wn.2d 775, 780-81, 801 P.2d 975 (1990). Independent evidence is sufficient if it prima facie establishes the corpus delicti. *State v. Meyer*, 37 Wn.2d 759, 763-64, 226 P.2d 204 (1951). That is to say, the evidence need not establish the corpus delicti beyond a reasonable doubt or even by a preponderance of the evidence. *Meyer*, at 763. Rather, a prima facie showing simply requires evidence which supports a logical and reasonable deduction that the crime occurred. *State v. Riley*, 121 Wn.2d 22, 32, 846 P.2d 1365 (1993) (citing *State v. Hamrick*, 19 Wn. App. 417, 419, 576

---

[5]The cases cited by Nelson to the contrary are distinguishable on their facts. In both cases, the requisite degree of formality was noticeably absent. *See United States v. Day*, 789 F.2d 1217 (6th Cir. 1986) (holding prior inconsistent statement made during informal interview inadmissible); *United States v. Dietrich*, 854 F.2d 1056 (7th Cir. 1988) (holding prior inconsistent statement made during interrogation inadmissible given the absence of legal formality). *Cf. United States v. Castro-Ayon*, 537 F.2d 1055, 37 A.L.R. Fed. 848 (9th Cir.) (holding prior inconsistent statement made during immigration interrogation admissible as substantive evidence), *cert. denied*, 429 U.S. 983 (1976).

P.2d 912 (1978)). The reviewing court must assume the truth of the State's evidence and must draw all reasonable inferences in favor of the State. *State v. Neslund*, 50 Wn. App. 531, 544, 749 P.2d 725 (citing *Bremerton v. Corbett*, 106 Wn.2d 569, 571, 723 P.2d 1135 (1986)), *review denied*, 110 Wn.2d 1025 (1988).

Nelson contends that his admissions to the police should have been excluded because the evidence was not sufficient to establish the corpus delicti of the crime of promoting prostitution in the first degree.[6] In particular, Nelson claims that Cahoon's hearsay statements were insufficient to show that he was the particular person who advanced or profited from the prostitution of a person under the age of 18.

■ While the State must always prove the identity of the accused, proof of the identity of the person who committed the crime is not an element of the corpus delicti. Rather, to establish the corpus delicti, the State need only offer proof that *someone* committed the crime.[7] *Meyer*, at 763; *Corbett*, at 574. Thus, a conviction for promoting prostitution in the first degree simply requires proof that someone profited from the prostitution of a person less than 18 years old.[8] *See* RCW 9A.88.070(1)(b).

Here, drawing all reasonable inferences in favor of the State, we find that Cahoon's statement — "I'm supposed to

---

[6]A person is guilty of promoting prostitution in the first degree if he knowingly "[a]dvances and profits from prostitution of a person less than eighteen years old." RCW 9A.88.070(1)(b).

[7]As Nelson notes, Washington courts have recognized that there are certain crimes where the identity of a particular person must be established as part of the corpus delicti (*e.g.*, reckless or drunken driving, attempt, conspiracy, perjury). *Smith*, at 781. Those crimes, however, inherently require proof of identity; the fact that a crime occurred cannot be established without the identification of a particular person. *See Corbett*, at 574. Promoting prostitution in the first degree is not a crime of that nature. Rather, the fact that a crime occurred is established by proof that *someone* profited from the prostitution of a minor. RCW 9A.88.070(1)(b). A defendant may satisfy a jury at trial that he was not the person who profited from such acts. But that issue is entirely separate from the initial question of whether the body of the crime has been established.

[8]Significantly, even if identity had to be established as part of the corpus delicti, Nelson's claim would still fail given that Cahoon's written statement, which specifically identified Nelson, was properly admitted into evidence.

get at least $30" — is prima facie sufficient to establish the crime charged. Specifically, one can reasonably infer from Cahoon's statement that she was under instruction to engage in sexual acts and that someone else was profiting from such acts. Nelson's admissions were therefore properly admitted to support his conviction.

 We next consider whether Nelson's conviction should be reversed or dismissed because the record is insufficient for review. Nelson contends that the trial court's failure to enter written findings and conclusions as to the suppression hearing and trial requires reversal. As the State notes, however, this failing has since been remedied. In particular, the court has complied with CrR 3.6 and CrR 6.1 by filing written findings of fact and conclusions of law. Thus, because there is no fixed time limit for the entry of findings and conclusions[9] and because Nelson has made no claim of prejudice or tailoring,[10] we can find no error on this basis.

We next consider whether the record supports a finding that Nelson's custodial statements were voluntary.

 A voluntary waiver of the privilege against self-incrimination must be preceded by *Miranda* warnings. *Colorado v. Spring*, 479 U.S. 564, 574, 93 L. Ed. 2d 954, 107 S. Ct. 851 (1987). The State has the burden of proving by a preponderance of the evidence that a confession was voluntary. *State v. Wolfer*, 39 Wn. App. 287, 290, 693 P.2d 154 (1984), *review denied*, 103 Wn.2d 1028 (1985).

Nelson contends that his custodial statements should have been suppressed because the trial court's finding that

---

[9]*See State v. Smith*, 68 Wn. App. 201, 204-05, 842 P.2d 494 (1992) (noting that no fixed time limit is prescribed for the entry of CrR 3.6 findings); *State v. McGary*, 37 Wn. App. 856, 861, 683 P.2d 1125 (stating that findings and conclusions may be filed while appeal is pending), *review denied*, 102 Wn.2d 1024 (1984).

[10]*See State v. Brown*, 68 Wn. App. 480, 485-86, 843 P.2d 1098 (1993) (finding no prejudice even though findings and conclusions were prepared 6 months after notice of appeal); *State v. Koepke*, 47 Wn. App. 897, 902, 738 P.2d 295 (1987) (finding no prejudice even though findings and conclusions entered after filing of notice of appeal); *McGary*, at 861 (stating that appellant must show prejudice arising from belated entry of findings).

he received his *Miranda* rights at the time of arrest is clearly erroneous. In particular, Nelson claims that Detective Kallas specifically testified at trial that Nelson was not advised of his *Miranda* rights at the time of arrest. We reject Nelson's contention.

During cross examination, defense counsel asked Kallas:

Q: Can you give us any time estimate between the time Mr. Nelson was handcuffed and the time you left the scene?

A: Seven, eight minutes.

Q: And at no time during that seven or eight minutes do you remember him being read his rights, is that correct?

A: No, he was taken to a patrol car, so I do not know. Not in my presence.

This testimony is consistent with the trial court's finding that Kallas could not recall whether Nelson received his *Miranda* rights or not; Kallas never stated that Nelson was not, in fact, advised. Lasnier, on the other hand, was positive that he advised Nelson of his *Miranda* rights. We therefore find that, based on Lasnier's testimony, the trial court did not err in finding that Nelson received his *Miranda* rights at the time of arrest and that his subsequent waiver was voluntary.[11]

We last consider Nelson's contention that his conviction should be reversed and dismissed because the court did not find all the elements of the crime of promoting prostitution in the first degree. Our review of the trial court's uncontested written findings indicates that there was no error on this basis. In particular, the court specifically states that Cahoon was a juvenile, that she engaged in negotiations for an act of prostitution, that Nelson knew she was a juvenile, and that he profited from her prostitution. *See* RCW 9A.88.070(1)(b). We therefore hold that the trial court properly found each and every element of promoting prostitution in the first degree.

---

[11]Nelson additionally contends that the absence of specific findings by the trial court amounts to a failure of the State to prove by a preponderance that Nelson heard his *Miranda* rights, understood them, and actually waived them. Because the trial court has entered specific, uncontested written findings on this issue, however, Nelson's claim of error is without merit.

The judgment and sentence of the trial court are affirmed.

WEBSTER, C.J., and GROSSE, J., concur.

Review denied at 125 Wn. 2d 1002 (1994).