



MAY -9 2013

# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30340-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER CORRECTING |
| JOSE LUIS NIEVES, | ) | OPINION |
| | ) | |
| Appellant. | ) | |

IT IS ORDERED the court's opinion of May 7, 2013, is corrected as follows:

On page 3, lines 8 and 9, Soreño shall be deleted and Sureño put in its place.

DATED: May 9, 2013

FOR THE COURT:

PANEL: Judges Korsmo, Brown, Siddoway

KEVIN M. KORSMO
Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30340-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JOSE LUIS NIEVES, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — A Grant County jury convicted Mr. Jose Luis Nieves of assault

in the first degree, intimidating a public servant, drive-by shooting, unlawful possession

of a firearm, and three counts of intimidating a witness, most of which included various

enhancements and aggravating factors. We reverse the three convictions for intimidating

a witness due to instructional error. We affirm all other aspects of his trial and remand

for further proceedings.

FACTS

On October 31, 2010, Mr. Nieves, Mr. Eduardo Najera Cruz, Mr. Salvador Garcia,

and Mr. Luis Enrique Flores Martinez attended a Halloween party in Othello. Around

11:00 p.m., the four men left together in Mr. Martinez's car to meet up with some young women in Soap Lake. When they got to Soap Lake, they picked up Ms. Vanessa Barajas, Ms. Sashea Hollis, Ms. Silvia Espino, and Ms. Rosamaria Montano. The enlarged group headed to a different party, but never arrived at it.

Shortly after midnight, Soap Lake Police Officer Dustin Slabach was in uniform and on patrol in a fully marked police car. Around this time, the officer's attention was drawn to Mr. Martinez's car because it had a taillight out. Officer Slabach followed for a while and eventually saw an illegal U-turn. The officer activated his lights and attempted to make a traffic stop.

Instead of stopping, Mr. Martinez kept going and started to speed up at Mr. Nieves's urging. As Officer Slabach looked down to report the speed to dispatch he heard what he believed to be eight to ten gunshots in the span of about two seconds. At the time the shots were fired, he was about three car lengths behind Mr. Martinez's car. Upon hearing the shots, Officer Slabach slowed down to put a safer distance between him and the car. He quickly stopped pursuit and soon pulled over due to an unrelated vehicle malfunction.

According to various witness accounts, Mr. Nieves either pulled the gun from his sweater or was handed the gun at his request and started shooting out the window. Ms. Montano was the only person who actually claimed to see the direction in which Mr.

2

Nieves shot the gun. According to her written statement to police, Mr. Nieves "pointed back towards the cop and fired about five more times." Ex. 84 at 2-3.

Mr. Martinez decided to abandon the car. Everyone immediately got out and started running. At one point during their flight, Mr. Nieves stopped the group, loaded his gun, and said, "whoever snitches me out, when I come out, I'm going to kill you guys." Report of Proceedings (RP) at 246. Mr. Nieves then singled out Ms. Barajas and said, "especially you." *Id.* He singled her out because he knew that her cousin was a "buster," which is a Soreño slur for members of rival Norteño gangs. Mr. Nieves was a member of the South Side Locos, a local Soreño gang.

The next day, Mr. Martinez went to the police and reported the car stolen at the party. Mr. Martinez returned to the police on the following day, confessed to the incident, and informed them of Mr. Nieves's involvement. He said that he had falsely reported the first time out of fear of being a suspect in the drive-by shooting.

After the identification of Mr. Nieves as the shooter, police went to his mother's house and arrested him on an unrelated probation violation. Later that day, police obtained and executed a search warrant for the house. During the search, police found a 9mm pistol wrapped in a blue bandana. In a nearby closet, police found a box of bullets that matched the brand of the two 9mm bullet casings that police found along the

3

highway near the shooting. Ballistics testing later identified the gun as the weapon that fired the casings found along the highway.

The State filed seven felony charges against Mr. Nieves. He defended on the basis that he was not present during the shooting and flight, but was at a party. Nonetheless, the jury found Mr. Nieves guilty on all charges and found that five of them were committed with a deadly weapon. The court subsequently imposed an exceptional sentence of 500 months on the assault count. He timely appealed to this court.

## ANALYSIS

Mr. Nieves presents a number of issues on appeal. First, he argues that the State did not present sufficient evidence of each of the alternative means of intimidating a witness. Second, he argues that the definition of "threat" used at his trial misstates the law. Third, he argues the trial court erred by admitting evidence pertaining to his gang and his gang membership and, fourth, that two of the jury instructions relating to his gang membership deprived him of a fair trial. Fifth, he argues that the trial court erred by admitting two *Smith*[1] affidavits. Sixth, he argues RCW 9A.36.045(1) (criminalizing drive-by shootings) as originally enacted violated Washington State Constitution article

---

[1] *State v. Smith*, 97 Wn.2d 856, 651 P.2d 207 (1982).

II, section 19.[2] Seventh, he argues that the State failed to present sufficient evidence of the crime of assault in the first degree. Eighth, he argues that the trial judge commented on the evidence in violation of Washington State Constitution article IV, section 16.[3] Ninth, he argues that the warrant to search his mother's house lacked probable cause. Tenth, he argues the sentencing court exceeded its authority by ordering him to pay a second DNA (deoxyribonucleic acid) fee.[4] We take these issues up in turn.[5]

*Witness Intimidation*

The jury convicted Mr. Nieves of intimidation of three witnesses: Mr. Luis Enrique Flores Martinez, Ms. Vanessa Barajas, and Ms. Silvia Espino. The instructions read:

---

[2] This argument is meritless. A constitutionally infirm statute may be cured by a later amendment or reenactment, which we presume to be constitutional absent argument to the contrary. *Morin v. Harrell*, 161 Wn.2d 226, 228, 231-32, 164 P.3d 495 (2007). The statute has been amended on multiple occasions since its enactment, including by Initiative 159. LAWS OF 1995, ch. 129, § 8. For similar reasons, we also decline to review his second contention that the original title of the bill that criminalized drive-by shooting created an implied element.

[3] We decline to review this argument because it was not properly briefed. *See Alexander v. Gonser*, 42 Wn. App. 234, 236 n.2, 711 P.2d 347 (1985).

[4] This contention also is meritless since RCW 43.43.754(2) is written in permissive language neither requiring, nor prohibiting, courts from ordering a second DNA fee and sample from repeat offenders.

[5] He also presents a cumulative error argument that we do not address in light of the fact that we find only a single error.

5

To convict the defendant of the crime of intimidating a witness as charged in Count 5, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about November 1, 2010, the defendant by use of a threat against a current or prospective witness, to-wit: [victim], attempted to

(a) influence the testimony of that other person or

(b) induce that person to elude legal process summoning him or her to testify or

(c) induce that person to absent himself or herself from an official proceeding or

(d) induce that person not to report the information relevant to a criminal investigation or

(e) induce that person not to have the crime prosecuted or

(f) induce that person not to give truthful or complete information relevant to a criminal investigation; and

(2) That this act occurred in the State of Washington.

If you find from the evidence that element (2) and any of alternative elements (1)(a), (1)(b), (1)(c), (1)(d), (1)(e) or (1)(f) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which alternatives (1)(a), (1)(b), (1)(c), (1)(d), (1)(e) or (1)(f) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of elements (1) or (2), then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 670.

Unless it elects between the alternative means, the State must present sufficient evidence to convict on each and every alternative means presented to the jury. *State v. Boiko*, 131 Wn. App. 595, 598-99, 128 P.3d 143 (2006). Mr. Nieves argues that the State

failed to present sufficient evidence to convict him of each of the alternative means. We agree.[6]

In *Boiko*, the defendant also was convicted of intimidating a "current or prospective witness." *Id.* at 598. Mr. Boiko's friend had raped a minor and Mr. Boiko later told the victim that "he was going to shoot her horse if she did not lie about" the friend. *Id.* at 597. Here, Mr. Nieves pulled out his gun, loaded it, and told the group, "whoever snitches me out, when I come out, I'm going to kill you guys." RP at 246. Just as in this case, the trial court in *Boiko* instructed on each of the alternative means for committing this crime. *Boiko*, 131 Wn. App. at 598. As here, there was no election of means in *Boiko*. *Id.* at 599.

This court reversed because "there is no evidence that Mr. Boiko attempted to induce [the victim] to elude legal process summoning her to testify or that he attempted to induce her to absent herself from such proceeding." *Id.* at 600. Those same alternative means were instructed in this case under (1)(b) and (1)(c) above.

Following *Boiko*, Mr. Nieves argues that the State failed to present sufficient evidence to convict him of these alternative means. A threat to kill people who snitch immediately after the crime has been committed is not an attempt to induce them to elude

---

[6] The State tries to distinguish *Boiko* based on the instruction given in that case. However, the two instructions have no meaningful difference.

a summons under alternative (1)(b) because no summons has been issued. The threat

also failed to satisfy alternative (1)(c) because it was not an attempt to induce someone to

absent themselves from an official proceeding that does not yet, and might never, exist.

Mr. Nieves also challenges the sufficiency with regards to alternatives (1)(e) and

(1)(f). We agree that the evidence is insufficient under alternative (1)(e) because a threat

to nonvictim witnesses who have no say in or control over charging decisions is not an

attempt to have the crime not prosecuted. Mr. Nieves's threat to kill any snitchers does,

however, satisfy alternative (1)(f) because someone who gives truthful or complete

information to authorities would be "snitching." While the evidence supports some of the

alternative instructional theories, it does not support all of them. The three counts are

reversed and remanded for a new trial with proper instructions. *Boiko*, 131 Wn. App. at

601.

*Sufficiency of WPIC 2.24's Definition of "Threat"*

Mr. Nieves next argues that WPIC[7] 2.24, used in this case to define "threat" for

the intimating a public servant count, exceeds the statutory definition by encompassing

nonverbal threats where RCW 9A.76.180(3) only reaches verbally communicated threats.

---

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS:
CRIMINAL (3d ed. 2008) (WPIC).

This is a question of statutory interpretation, which we review de novo. *Berger v. Sonneland*, 144 Wn.2d 91, 104-05, 26 P.3d 257 (2001).

"A person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant." RCW 9A.76.180(1).[8] "Threat" means: "(a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or (b) Threats as defined in RCW 9A.04.110." RCW 9A.76.180(3). In turn, RCW 9A.04.110(28) also defines "threat" in terms of "to communicate." Thus, under both subsections (a) and (b) of section 180, threat means "to communicate." The legislature has not defined the word "communicate." Where the legislature does not specifically define a statutory term, the court will read the word according to its plain and ordinary meaning. *First Covenant Church v. City of Seattle*, 120 Wn.2d 203, 220, 840 P.2d 174 (1992).

Several Washington cases have held under these statutes that communication encompasses both verbal and nonverbal communication. In *Burke*, this court held that a defendant's fighting stance "like a boxer" met the definition of a "threat" under this statute. *State v. Burke*, 132 Wn. App. 415, 421, 132 P.3d 1095 (2006). In *Toscano*, this

---

[8] We quote the current version of RCW 9A.76.180(1), which was amended by Laws of 2011, ch. 336, § 407, to make the language gender neutral.

court agreed with *Burke* and held that the crime of intimidating a public servant encompasses nonverbal threats. *State v. Toscano*, 166 Wn. App. 546, 554, 271 P.3d 912, *review denied*, 174 Wn.2d 1013 (2012). There, however, we reversed the conviction because the acts of failing to yield and blocking an intersection for the purpose of interrupting a police chase were "not clear nonverbal communication" like in *Burke*. *Id.*

In analogous circumstances, courts have held that the display of a deadly weapon alone can be sufficient to communicate a threat. This court once determined that the nonverbal act of setting a gun down next to a rape victim was sufficiently threatening to constitute "threatened . . . use of a deadly weapon" for first degree rape. *State v. Lubers*, 81 Wn. App. 614, 620-21, 915 P.2d 1157 (1996). The definition of "threatens" as used in the rape statute is the same definition used in the crime of intimidating a public servant. *State v. Bright*, 129 Wn.2d 257, 270, 916 P.2d 922 (1996) (defining "threatens" for purposes of rape by reference to RCW 9A.04.110). In *Bright* the court concluded that the act of wearing a holstered weapon while committing a rape constituted a "threat" under RCW 9A.04.110. *Bright*, 129 Wn.2d at 270.

We believe that if displaying a deadly weapon is sufficient to constitute a threat, the act of firing that weapon at another person undeniably constitutes the communication

of a threat for purposes of RCW 9A.76.180(3)(b) and RCW 9A.04.110. Thus, WPIC 2.24 does not misstate the law and the trial court did not err in using it here.

*Admissibility of Gang-Related Evidence*

The court admitted substantial evidence of Mr. Nieves's membership in the South Side Locos, crimes committed by the Locos, and the identity of other Locos members. Mr. Nieves challenges the admission of this evidence as irrelevant under ER 401 and 402, unfairly prejudicial under ER 403 because of its irrelevance, and inadmissible character evidence under ER 404.

Evidentiary rulings are reviewed for abuse of discretion. *State v. Guloy*, 104 Wn.2d 412, 429-30, 705 P.2d 1182 (1985). "In close cases, the balance must be tipped in favor of the defendant." *State v. Wilson*, 144 Wn. App. 166, 177, 181 P.3d 887 (2008). An erroneous evidentiary ruling is not prejudicial "unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980).

Because of First Amendment concerns, "evidence of criminal street gang affiliation is not admissible in a criminal trial when it merely reflects a person's beliefs or associations." *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). "Accordingly, to admit gang affiliation evidence there must be a nexus between the crime and gang membership." *Id.* Here, the trial court admitted the evidence to prove: (1) the special

11

allegation of criminal street gang membership under RCW 9.94A.829; (2) who committed the crime of witness intimidation against Ms. Barajas; and (3) both Mr. Nieves's unlawful possession of a firearm and his use of the firearm against Officer Slabach. The evidence was relevant for each of these purposes.

The special allegation required proof that Mr. Nieves belonged to a "criminal street gang." RCW 9.94A.829. The South Side Locos is not a "criminal street gang" unless it is a gang. The Locos is not a gang unless it is a "group of three or more persons." RCW 9.94A.030(12). Thus, the State needed to present evidence that the Locos had other members. The Locos also is not a gang unless it has "a common name or common identifying sign or symbol." *Id.* Thus, the State needed to present evidence regarding the Locos' identifying symbols and characteristics.

A gang is not a "criminal street gang" unless it has "as one of its primary activities the commission of criminal acts," that its members "engage in or have engaged in a pattern of criminal street gang activity," and that the Locos operate on an ongoing basis. *Id.* Thus, the State needed to present evidence of other crimes committed by the Locos to show that it was an ongoing criminal organization and that these crimes were committed to further the gang's interests or to further the status of one of its members. Thus, the gang evidence presented by the State was relevant to proving the special allegation.

While that reason alone is sufficient to support the court's ruling, the evidence also was properly admitted for the other identified purposes. The use of Sureño slang to threaten Ms. Barajas helped identify Mr. Nieves as the one who intimidated her.[9] The use of a gang slur suggested that a gang member made the threat. Thus, the evidence helped the State prove its case on that count.

Finally, the gang evidence also was relevant to prove possession of the gun. The fact that it was wrapped in a blue bandana is what tied Mr. Nieves to the gun, but the evidence was meaningless without the knowledge that the blue bandana also was the uniform and a symbol of Mr. Nieves's gang. Thus, the trial court did not err by finding the gang membership evidence relevant to proving who possessed the gun used in the drive-by shooting and to proving Mr. Nieves's unlawful possession of a firearm.[10]

Mr. Nieves also argues that the gang evidence was inadmissible character evidence under ER 404. However, it was admissible for several reasons, including proof of identity. ER 404(b). In addition to proving the "criminal street gang member or associate" element, the evidence also identified Ms. Barajas's intimidator and the identity of the owner of the gun found at Mr. Nieves's home.

---

[9] He denied being present during the shooting and subsequent flight.

[10] Because Mr. Nieves's ER 403 argument hinged on the evidence being irrelevant, that contention also necessarily fails.

13

Mr. Nieves also argues that the trial court erred in failing to conduct a complete ER 404(b) analysis on the record. "Before admitting evidence under ER 404(b), 'the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect.'" *State v. McCreven*, 170 Wn. App. 444, 458, 284 P.3d 793 (2012) (internal quotation marks omitted) (quoting *State v. Asaeli*, 150 Wn. App. 543, 576, 208 P.3d 1136 (2009)), *review denied*, 176 Wn.2d 1015 (2013). Failure to conduct such an analysis on the record is an evidentiary error. *Id.* at 455. However, the error is not reversible unless it is shown to be harmful. *Id.* at 460.

The error in *McCreven* was harmful because the gang evidence at issue there was irrelevant to prove identity because it was evidence about a gang other than the one to which the defendants belonged. *Id.* at 455-56. Furthermore, McCreven did not receive a proper limiting instruction. *Id.* at 456-57. Neither deficiency is present in this case. Even if a complete balancing was not conducted on the record, the trial court's reasoning is sufficiently in the record to explain the ruling. The court did not err by admitting the gang-related evidence.

14

*Gang-Related Jury Instructions*

Mr. Nieves next challenges the trial court's jury instructions that defined several gang-related terms and limited the use of the gang-related evidence. "We review the court's choice of jury instructions for abuse of discretion." *State v. Butler*, 165 Wn. App. 820, 835, 269 P.3d 315 (2012). But, we "review claims of legal error, including whether the instruction amounts to a comment on the evidence, de novo." *Id.*

Instruction 45 defined "criminal street gang," "criminal street gang member or associate," "pattern of criminal street gang activity," and "criminal street gang-related offense." For reasons similar to why the gang-related evidence was relevant to proving the special allegation, these statutory definitions were also necessary for the jury to determine whether the special allegation of criminal street gang membership applied.

RCW 9.94A.829 establishes a special allegation that the offense of unlawful possession of a firearm was committed by "[a] criminal street gang member or associate." To apply this special allegation, the jury must find "by a preponderance of the evidence that the accused is a criminal street gang member or associate as defined in RCW 9.94A.030." RCW 9.94A.829. "Criminal street gang member or associate" is a statutory term of art; thus, the jury needed to know how the legislature defined it.

That term is defined by reference to another statutory term of art: the person's participation in a "criminal street gang." RCW 9.94A.030(12). "Criminal street gang" is

defined by reference to yet another statutory term of art: the gang members must engage in a "pattern of criminal street gang activity." *Id.* Finally, "pattern of criminal street gang activity" is defined by still another statutory term of art: the pattern of criminal activity must include "criminal street gang-related offenses." RCW 9.94A.030(36). Because each of the four terms defined in Instruction 45 was necessary for understanding and applying the special allegation, the trial court did not err by giving this instruction.

Mr. Nieves also takes exception to Instruction 46, which limited the use of the gang evidence to the three issues discussed above. He argues that the instruction was overly broad because the gang-related evidence was not admissible for each of the instructed purposes. Having already found that the trial court properly admitted the gang-related evidence, this argument necessarily fails. The court likewise did not err in giving Instruction 46.

*Admissibility of the Smith Affidavits*

At trial, the State called Ms. Espino and Ms. Montano as witnesses, but they contradicted their previous statements to police when they took the stand. The State was then permitted to impeach their testimony through admission of their *Smith* affidavits. In *Smith*, the Supreme Court held that a "sworn statement given during a police-station interrogation" is admissible under ER 801(d)(1) as long as "'[m]inimal guarantees of

truthfulness'" were met. *Smith*, 97 Wn.2d at 861-62 (quoting D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 419, at 169-71 (1980)).

In *Smith*, those minimal guarantees of truthfulness were that "the statement was attested to before a notary, under oath and subject to penalty for perjury." *Id.* at 862. "Additionally, the witness wrote the statement in her own words." *Id.* But, *Smith* did not hold that each of those is necessary in every case and did not define "minimal guarantees of truthfulness" because "each case depends on its facts with reliability the key." *Id.* at 863. Along with "minimal guarantees of truthfulness," the court must also consider "whether the witness voluntarily made the statement," "whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause," and "whether the witness was subject to cross examination when giving the subsequent inconsistent statement." *State v. Nelson*, 74 Wn. App. 380, 387, 874 P.2d 170 (1994) (citing *Smith*, 97 Wn.2d at 861-63).

"The proponent of the statement's admissibility bears the burden of proving each of these elements." *State v. Nieto*, 119 Wn. App. 157, 161, 79 P.3d 473 (2003). The decision to admit evidence is reviewed for an abuse of discretion. *Id.* "If the trial court based its evidentiary ruling on an incomplete legal analysis or a misapprehension of legal issues, the ruling may be an abuse of discretion." *Id.* Mr. Nieves argues that the trial court abused its discretion by admitting the affidavits.

17

No. 30340-3-III
State v. Nieves

*Minimal guarantees of truthfulness.* An unsworn statement may have the same force and effect as a sworn statement if it:

> (1) Recites that it is certified or declared by the person to be true under penalty of perjury;
> (2) Is subscribed by the person;
> (3) States the date and place of its execution; and
> (4) States that it is so certified or declared under the laws of the state of Washington.

RCW 9A.72.085.

In *Nelson*, this court held that a *Smith* statement made in compliance with this statute satisfies the minimal guarantees of truthfulness. 74 Wn. App. at 390. In the present case, the affidavits fully complied with RCW 9A.72.085.

Mr. Nieves invites this court to hold that these statements must be notarized in order to satisfy the minimal guarantees of truthfulness because affidavits in *Smith* and *Nelson* were both notarized. In light of the fact that RCW 9A.72.085 exists to guarantee truthfulness in the absence of a statement being notarized, we decline to hold that *Smith* affidavits always require a notary's services. Accordingly, the *Smith* affidavits in this case satisfy the minimal guarantees of truthfulness.

*Voluntariness of the statements.* Mr. Nieves next challenges the voluntariness of the statements. *Nelson* is the only case to explicitly discuss voluntariness. There, a woman arrested for prostitution was allegedly promised by police that charges would not be pressed and she would be released if she named her pimp. *Nelson*, 74 Wn. App. at

18

388. The appellant argued that the statement was coerced by these promises, but the Court of Appeals disagreed because when police broke their alleged promise to the witness she did not appear upset about it. *Id.* This implies that (1) the alleged promise was never made or (2) she did not rely on the promise when making her statement.

In the present case, the question of voluntariness revolves around the effect of two days of questioning of the witnesses. The two young women were initially questioned separately on November 3, 2010. Ms. Espino was 15 years old when police questioned her and 16 at the time of trial. She was questioned alone by two male detectives and did not want to talk to them. Displeased with Ms. Espino's silence, the detectives decided to lie to her and threaten her in order to coax her to talk. One detective started suggesting that she shot at the officer. Ms. Espino continued to deny her guilt. The detective proceeded to tell her that Mr. Nieves accused her of being the shooter and that she faced life in prison for the attempted murder of a police officer if she did not talk. The detective told her that she might as well be dead if she did not cooperate. He told her that the officer was shot. He told her that "the big boy [is saying that] [t]he bitches did it." RP at 621. Mr. Nieves in fact never once spoke to police and never once made any accusations.

While going through the *Smith* factors, the court permitted Mr. Nieves's counsel to read an excerpt of this detective's statements from the interview transcript to refresh Ms. Espino's memory:

> Well, you might—you might have done it, that's for you to decide. That's for you to make the determination. You were in the car, so it's one of eight. There was eight people in the car. You were one. Do you understand what I'm saying? Do you understand that the boy that probably did it has a lot to lose—meaning he's got a lot to lose? Do you know what he's going to do, he's going to try to pin it off on somebody else. Now, you can sit here as smug as you want to sit—
>
> . . . .
>
> —you can sit here as smug as you want to sit and sit there and act like you don't care, but understand that you've got the rest of your life to think about it and if your DNA and fingerprints are in the car, there ain't nothing from him saying, yup, she did it, Silvia [Espino] did it, I didn't do it. Do you understand that? Do you understand that what the rest of your life is might as well be being dead?

RP at 610-11. The detectives then transitioned into discussing Ms. Espino's two brothers-in-law who had been murdered recently. At that point, Ms. Espino started crying and asking for her mom, which caused the detectives to end the interview.

The following day, Ms. Espino agreed to give a statement. During this second interview, a different detective was present as well as a female juvenile corrections officer. Ms. Espino was also told during this second interview that she could leave at any time. She explained her changed attitude as caused by a conversation she had with her mother after the first interview who also told Ms. Espino that she was being accused of

the shooting. Her mother's misinformation came from the same detective who said Ms. Espino might as well be dead.

On November 3, 2010, the same two detectives also questioned Ms. Montano. She was 13 years old. Like her sister, Ms. Montano did not want to talk to them. To get her to talk, the detectives made her fear for her sister. At one point, a detective told her, "Maybe you don't care about your sister or maybe it's not you that [Mr. Nieves] dimes out, maybe it's your sister. You don't care about her either?" RP at 742. Ms. Montano responded that she did care about her sister. To which, the detective responded, "why are you going to let [Mr. Nieves] do that to your sister? . . . Dime your sister out. Said Silvia [Espino] did it." RP at 747.

The following day, Ms. Montano agreed to make a statement to the same detective and the juvenile corrections officer who were present for Ms. Espino's second interview. When the detectives asked Ms. Espino why she had changed her mind about talking, she responded, "it was because my mom told me that [the detective] said that I could get in trouble for it and get 25 years for something that I didn't do." RP at 737.

Compared to *Nelson*, the voluntariness of Ms. Espino's and Ms. Montano's statements is questionable due to the coercive tactics applied here. Both young women stated that these tactics did in fact influence their decision to make the statements.

However, the affidavits still contained minimal guarantees of truthfulness, were taken as standard procedure for determining the existence of probable cause, and the witnesses were subject to extensive cross-examination at trial. The trial court permitted defense counsel to read extensively from the interview transcripts, giving the jury the flavor of the interrogation that led to the affidavits. Thus, even if the statements were not voluntary, that factor does not so obviously outweigh the other three factors as to render the admission of the affidavits an abuse of discretion.

*Sufficient Evidence of Assault in the First Degree*

In addressing a sufficiency of the evidence challenge, we view the evidence in a light most favorable to the State and ask whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990). Here, Mr. Nieves argues that there was insufficient evidence of his specific intent to assault Officer Slabach.

His argument is based on the fact that there was no live testimony regarding where Mr. Nieves aimed the gun. Officer Slabach was looking down at his speedometer. Ms. Barajas ducked. Mr. Martinez only saw Mr. Nieves point the gun out the window. Ms. Espino and Ms. Montano both denied Mr. Nieves's very presence. However, Ms. Montano's affidavit says that Mr. Nieves "pointed back towards the cop and fired about five more times." Viewing the evidence in a light most favorable to the State, Ms.

22

Montano's affidavit is sufficient for a jury to find beyond a reasonable doubt that Mr. Nieves had specific intent to assault Officer Slabach.

*Probable Cause to Search Mr. Nieves's Mother's House*

"A search warrant may issue only upon a determination of probable cause." *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Probable cause exists when the evidence establishes "a reasonable inference" that "evidence of a crime can be found at the place to be searched." *Id.* The probable cause showing also "'requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.'" *Id.* (quoting *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)). "Although we defer to the magistrate's determination, the trial court's assessment of probable cause is a legal conclusion we review de novo." *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008) (citing *State v. Chamberlin*, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007)).

A search warrant issued on November 2, 2010, authorizing a search of Mr. Nieves's mother's house, where Mr. Nieves lived, for "firearms [and] ammunition apparently accessible by [Mr.] Nieves prior to his arrest." CP at 68. Mr. Nieves argues that the detective did not have any information establishing a nexus between the house and the gun. Because the gun was last seen two days earlier in Ephrata, Washington

23

(over 30 miles from Mr. Nieves's Royal City home), he argues that the gun was no more likely to be found in his home than in Ephrata.

*Thein* held that the State cannot establish a nexus between the items to be seized and the place to be searched simply because the suspect resides at the place to be searched. *Thein*, 138 Wn.2d at 148-49. However, *Thein* does have limits. It specifically exempted "personal items of continuing utility" from its holding. *Id.* at 149 n.4. The court noted that in "specific circumstances it may be reasonable to infer such items will likely be kept where the person lives." *Id.* "'Where the object of the search is a weapon used in the [commission of a] crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to police.'" *Id.* (alteration in original) (quoting WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.7(d), at 381-85 (3d ed. 1996).

We believe a firearm is a "personal item of continuing utility" that is usually kept at a suspect's residence. In this case, it was all the more likely to be found at the residence because Mr. Nieves was arrested less than two days after commission of the crime and before he knew that he had been identified to the police. Furthermore, the fact that Mr. Nieves reloaded the gun and threatened to shoot anyone who snitched suggested his intent to retain possession of the firearm. Because no firearm was found on Mr.

24

Nieves at the time of his arrest, it was likely that the firearm was nearby the place of arrest (i.e., his house). Putting these facts together, there was probable cause to believe that Mr. Nieves's gun would be found at his residence.

Affirmed in part, reversed in part, and remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, C.J.

WE CONCUR:

_____
Brown, J.

_____
Siddoway, J.

25