[No. 18019-7-II.   Division Two.   May 10, 1996.]
THE STATE OF WASHINGTON, *Respondent*, v.
SEBASTIAN LARRY LUBERS, *Appellant*.

---

*Pattie Mhoon*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey–Boulet, Deputy*, for respondent.

HOUGHTON, J. — Sebastian Larry Lubers appeals his Pierce County jury convictions for rape in the first degree and witness tampering. He challenges the sufficiency of

the evidence on both counts, and argues that the trial court erred by excluding evidence of the complaining witness's motive to accuse him falsely and by not granting him a new trial. We affirm.

## FACTS

Lubers was accused of raping S, age 14. Christopher Joseph, a friend of Lubers, was also charged, but the State agreed to drop the charge against Joseph if he testified truthfully. Joseph testified that on the night of June 23, 1993, he and Lubers drank a bottle of "Mad Dog 20/20" wine, called S, and arranged to pick her up around 11:00 p.m. Before picking up S, Lubers added "Visine" to another wine bottle, apparently hoping that S would drink it and "pass out" so he could "have sex with her."

According to Joseph, after they picked up S, they drove to a park in Puyallup, where all three got out of the car. Lubers asked Joseph to retrieve a loaded revolver from the trunk, which he did. Lubers, Joseph, and S drank and spoke with some other people in the park, and then they proceeded to walk down a trail. Lubers and Joseph pretended that they were fighting, acting as though they were going to shoot each other. Lubers then asked Joseph to feign injury and, when S came over to see how he was, Lubers pushed her onto her back and had sexual intercourse with her. The gun was lying next to them.

S confirmed Joseph's description of the rape, except she testified that Lubers sat on her after he threw her to the ground, took the gun away from her, which she had for a short time, and set the gun aside. She testified that Joseph pulled her shirt up, held her head between his legs "like he was trying to choke [her]" while Lubers took off her clothes, and helped hold her down while Lubers raped her. She said that she struggled for awhile, but she finally gave in because she remembered they had a gun and was afraid "they were going to shoot [her]." Both Joseph and S testified that S was crying when she came back down the trail.

The Puyallup police arrested Lubers several weeks later, after S identified him from a photographic montage. On October 1, 1993, in the course of his investigation, Puyallup Detective Matison took a statement from Joseph, which was similar to his later trial testimony. A few days later, Lubers called Joseph from jail and asked him to write a letter to Lubers' lawyer saying that Joseph had lied to Detective Matison. Lubers told Joseph to say that another man, a fictitious person named "Danny Cortez," was really the rapist, that "Cortez" had initially promised to pay Joseph $10,000 to name Lubers, and that later "Cortez" had threatened to kill Joseph's family unless he falsely accused Lubers.

Tyana Fisher testified that Lubers also called her from jail. He asked her to tell the prosecuting attorney that "Danny Cortez" had committed the rape and admitted to her that he had "stuck it in and out" of S, but only "for one minute or so."

The defense tried to establish that S had falsely accused Lubers of rape because of problems that Lubers' girlfriend, Juanita Black, was having with S's family. Specifically, defense counsel attempted to ask Juanita Black about incidents in which S's cousin and two of the cousin's friends allegedly beat her up, threw rocks at her, and talked behind her back; Black did not implicate S in any of those activities, however. The trial court sustained the State's objection that the proffered testimony was irrelevant.

## Analysis

On appeal from his convictions, Lubers first challenges the sufficiency of the evidence to convict him of the rape. Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it would permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (additional citation omitted). "A claim of insufficiency admits

the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201 (additional citation omitted).

Circumstantial evidence is equally as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). This court gives deference to the trier of fact, who resolves conflicting testimony, evaluates the credibility of witnesses, and generally weighs the persuasiveness of evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

First degree rape consists of sexual intercourse by forcible compulsion, where the perpetrator or an accessory to the crime uses or threatens to use a deadly weapon. RCW 9A.44.040(1)(a). The focus here is whether the defendant made a credible threat to use a deadly weapon, for it is the fear instilled in the victim by the threatened use of deadly force that elevates the crime of rape from second to first degree. *State v. Coe*, 109 Wn.2d 832, 845, 750 P.2d 208 (1988) (citing *State v. Hentz*, 99 Wn.2d 538, 544, 663 P.2d 476 (1983)). A threat of force may be implied. *State v. Weisberg*, 65 Wn. App. 721, 726, 829 P.2d 252 (1992) (forcible compulsion exists when an implied threat causes a victim's fear). Lubers argues that the deadly weapon element is missing from this case because neither he nor Joseph ever orally threatened S with the gun or pointed it at her. We disagree.

This case is similar to *State v. Eker*, 40 Wn. App. 134, 136-39, 697 P.2d 273, *review denied*, 104 Wn.2d 1002 (1985), in which three men raped a hitchhiker in a tractor-trailer. One of the men entered the trailer and obtained a gun, he ordered the victim into the trailer and stood guard outside while the defendant and the third man raped the victim. The guard then entered the trailer without the gun and raped the victim repeatedly.

The jury convicted the defendant of first degree rape,

finding in answers to special verdict forms that neither the defendant nor the accomplices were "armed with" a deadly weapon, but that the defendant or the accomplices were "armed with or in possession of" a deadly weapon. *Eker*, 40 Wn. App. at 137-38. This court affirmed the conviction, holding that availability of the deadly weapon to the defendant, or its possession by an accomplice, was sufficient to constitute a threat to use the weapon:

> The perpetrator of a crime need not be armed with a weapon in order to threaten to use one, if the victim knows that the weapon is available because it is in possession of the perpetrator or an accomplice.

*Eker*, 40 Wn. App. at 139 (citing *State v. Hauck*, 33 Wn. App. 75, 651 P.2d 1092 (1982), *review denied*, 99 Wn.2d 1001 (1983)).

Lubers' and Joseph's actions throughout the night set the stage for the rape. They picked S up around 11:00 p.m. and took her to an isolated area in a park. In S's presence, Lubers instructed Joseph to take a loaded gun from the trunk, and Joseph brought it into the park. Lubers and Joseph acted as though they might shoot each other and wrestled for the gun. S thought they were acting "weird" and asked to go home. Joseph then dropped the gun, and S picked it up and moved away from Lubers and Joseph. At Lubers' request, Joseph feigned injury to lure S back to them. When S checked on Joseph, Lubers pulled S off her feet, threw her to the ground, sat on top of her, took the gun, and according to S, he "tossed it aside." Joseph also testified that the gun was lying on the ground next to Lubers and S. Joseph wrapped his legs around S's neck, choked her, pulled up her shirt, and held her down while Lubers raped her. S testified that she quit struggling and submitted to the rape because she remembered the gun and was afraid of being shot. At some point during the rape, Joseph got up, took the gun, and went to stand at the bottom of the trail.

Not all threats come via words; a nonverbal threat can

be every bit as menacing. When Lubers set the gun down next to S and then proceeded to straddle and rape her, the rape was achieved by the threatened use of a deadly weapon. He did not need to articulate what was implied.

As in *Eker*, a rational trier of fact could have found a threat beyond a reasonable doubt based upon the presence of the gun next to S while Lubers raped her. Furthermore, it was the jury's place to determine whether S's belief that she was being threatened was credible.

This case is distinguishable from *State v. Bright*, 77 Wn. App. 304, 890 P.2d 487, *review granted*, 127 Wn.2d 1007 (1995). The defendant in *Bright* was a police officer who was charged with first degree rape for having sexual intercourse with a female prisoner he was transporting in his patrol car. Before committing the rape, he invited the woman to move from the car's back seat to the front seat, and he moved his jacket and a rifle from the front seat into the back to make room for her. *Bright*, 77 Wn. App. at 306. Although the parties disagreed about the sexual acts involved, the officer apparently kept his uniform on, including a pistol he was wearing, while the acts took place. *Bright*, 77 Wn. App. at 306-08. The victim testified that the police officer "did not *display*, mention, refer to, use or threaten to use" either of the two guns he had in the car. *Bright*, 77 Wn. App. at 310 (emphasis ours). Division III of this court reversed the conviction, holding that the victim's subjective fear is not determinative of whether the officer used or threatened to use a gun. *Bright*, 77 Wn. App. at 310.

The facts here are different from those in *Bright*. In *Bright*, the officer moved a rifle away from the victim and there was no display of the pistol, thus no threat. Here, a threat was clearly implied by repeated displays of the loaded gun, by Lubers' placing the gun next to the victim, and by Joseph's standing at the bottom of the trail with the gun. S's fear of the implied threat to use the gun was a natural result of these actions.

■ Lubers next challenges the sufficiency of the evi-

dence on the charge of witness tampering. The elements of that crime are set forth in RCW 9A.72.120:

> (1) A person is guilty of tampering with a witness if he . . . attempts to induce a witness or person he . . . has reason to believe is about to be called as a witness in any official proceeding or a person whom he . . . has reason to believe may have information relevant to a criminal investigation[1] to:
>
> (a) Testify falsely or, without right or privilege to do so, to withhold any testimony . . . .

Lubers argues that he is not guilty of witness tampering because the basis for the charge, Joseph's testimony that Lubers asked him to write a letter to Lubers' defense counsel saying that Joseph had lied in his statement to the detective and that "Danny Cortez" was really the rapist, did not describe an inducement of false testimony, but only of a false out-of-court statement.

The witness tampering statute requires that Lubers induce a "witness" or a person "about to be called as a witness" to give false testimony or withhold testimony. *See State v. Henshaw*, 62 Wn. App. 135, 813 P.2d 146 (1991).

Joseph testified that Lubers asked him to write a letter recanting information that he had given the police as part of a rape investigation, and stating that "Danny Cortez" committed the rape. Taking the evidence in the light most favorable to the State, Joseph was about to be called as a witness and he had information relevant to a police investigation. Lubers asked Joseph to make a false statement, effectively recanting a prior signed statement to the police, and thereby, to withhold information necessary to a criminal investigation. Joseph's testimony provided sufficient evidence for a rational trier of fact to find the statutory requirements for witness tampering beyond a reasonable doubt.

---

[1]The statute was amended in 1994 to add the reporting of "the abuse or neglect of a minor child"; this amendment does not impact the analysis herein. *See* LAWS OF 1994, ch. 271, § 205.

Lubers next contends that the trial court erred by foreclosing his examination of Juanita Black concerning the feud between Black and S's family as a motive for S to fabricate the rape accusation. Generally, the trial court has broad discretion regarding the admission or exclusion of evidence. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991). The court may admit relevant evidence; i.e., evidence that has a tendency to make more or less probable the existence of any fact of consequence to the determination of the action. ER 401. Evidence of bias and interest is relevant to a witness's credibility. *State v. Whyde*, 30 Wn. App. 162, 632 P.2d 913 (1981). However, extrinsic evidence cannot be used to impeach a witness on a collateral issue. *State v. Carlson*, 61 Wn. App. 865, 812 P.2d 536 (1991), *review denied*, 120 Wn.2d 1022 (1993). Where the credibility of the complaining witness is crucial, her possible motive to lie is not a collateral issue. *See Whyde*, 30 Wn. App. at 166; *State v. Roberts*, 25 Wn. App. 830, 834-35, 611 P.2d 1297 (1980).

The trial court did not abuse its discretion by excluding evidence of Juanita Black's feud with S's family. Lubers failed to show how this feud was relevant to S's motive to lie. In the offer of proof, Black mentioned hostile acts directed at her by S's cousin, but not by S. Moreover, even assuming that S herself was hostile toward Black, the defense did not explain how this translated into a desire to frame Lubers. The defense theory was wholly speculative in that regard.

Finally, Lubers contends that the trial court erred by permitting him to withdraw his motion for new trial. The motion was based upon newly discovered evidence in the form of a post-trial affidavit from Joseph, who averred that "Danny Cortez" had really had intercourse with S, but that Joseph had falsely implicated Lubers because Cortez had threatened to kill him. Later, when contacted by Detective Matison, Joseph retracted his recantation; still later, claiming to have been coerced by Matison to

624

stick to his trial testimony, Joseph went back to his story about "Danny Cortez." The State answered the motion with transcripts of Matison's original interview with Joseph, as well as the later interview in which Joseph retracted his recantation and reaffirmed his trial testimony. Joseph took the stand in support of the motion for new trial, admitting that his recantation was false and that his trial testimony implicating Lubers was true. Faced with this development, defense counsel withdrew the motion for new trial.

Lubers now argues that notwithstanding his lawyer's withdrawal of the motion, the court abused its discretion by not granting a new trial because Joseph's testimony, which was critical, was so obviously suspect. This argument fails. Apparently Joseph was willing to recant his trial testimony temporarily under pressure from Lubers, but not when placed under oath on the witness stand. The trial court had no reason to grant a motion for new trial.

Affirmed.

SEINFELD, C.J., and ARMSTRONG, J., concur.

Review denied at 130 Wn.2d 1008 (1996).