# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

    Respondent,

    v.

ABIGAIL MONDRAGON,

    Appellant.

_____

In the Matter of the Personal Restraint of

ABIGAIL MONDRAGON,

    Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 75538-2-I
(consolidated with
No. 76831-0-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: February 12, 2018

APPELWICK, J. — Mondragon was convicted of second degree assault. On appeal, she argues that her confrontation clause rights were violated, and that she received ineffective assistance of counsel. In a personal restraint petition, which is consolidated with her appeal, she contends, based on matters contained outside the record, that she received ineffective assistance of counsel. We affirm and deny the personal restraint petition.

## FACTS

Abigail Mondragon met Lindsay Dawson while in a group chat in connection with an online game that they both played. At that time, Mondragon was dating Michael Ridley-James, whom Dawson also met through the online game. Mondragon and Ridley-James had a relationship for about two years, and have a

daughter together. Ridley-James began dating Dawson after he and Mondragon ended their relationship. Mondragon sent Dawson harassing messages on Skype[1] after Mondragon and Ridley-James ended their relationship. Mondragon's harassing messages were about e-mails and suggestive photos that Dawson had sent Ridley-James. In March 2015, about four months into their romantic relationship, Dawson moved to Washington from Wisconsin to live with Ridley-James.

Dawson first saw Mondragon in person on Easter at the woodshop where Ridley-James occasionally works. Dawson testified that, on that day, Mondragon hit her in the face with her fist. Ridley-James also testified that Mondragon swung a closed fist at his face, hitting his cheek. Dawson called the police.

Mondragon was initially charged with assault in the second degree. Then, the State amended the information and added a charge of assault in the fourth degree (domestic violence).

Mondragon was tried by a jury and found guilty of second degree assault and not guilty of fourth degree assault. The court imposed a standard range sentence on the second degree assault conviction. Mondragon appeals. Mondragon also filed a personal restraint petition, which was consolidated with this appeal.

---

[1] Skype is a live video chat and long-distance voice calling service. It can also be used to send typed messages.

## DISCUSSION

I. <u>Appeal</u>

Mondragon argues that the trial court abused its discretion by limiting testimony on cross-examination of Dawson and Ridley-James about future plans with Ridley-James's and Mondragon's child. She argues that allowing Officer Weatherby to testify that the testimony of Dawson and Ridley-James was consistent with the statements of witnesses at the scene was error. Finally, she argues she received ineffective assistance of counsel.

A. <u>Excluding Testimony on Cross-Examination</u>

First, Mondragon argues that the court erred when it excluded counsel's questions to Dawson and Ridley-James about their alleged plans for the parenting of Mondragon's and Ridley-James's child. Mondragon argues that counsel should have been allowed to question Dawson about Dawson's and Ridley-James's plans for parenting the child, under a state of mind exception to hearsay. ER 803(a)(3). And, she argues that the trial court should have allowed her to question Ridley-James on this subject, to establish the witness's bias.

The right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; <u>State v Darden</u>, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). A trial court may, however, refuse to permit cross-examination where the circumstances only remotely tend to show bias or prejudice of the witness, where the evidence is vague, or where the evidence is merely argumentative and speculative. <u>State v. Guizzotti</u>, 60 Wn. App. 289, 293, 803 P.2d 808 (1991).

The court may admit relevant evidence, i.e., evidence that tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. ER 401; State v. Lubers, 81 Wn. App. 614, 623, 915 P.2d 1157 (1996). Evidence of bias and interest is relevant to a witness's credibility. Id. Bias includes that which exists at the time of trial, for the very purpose of impeachment is to provide information that the jury can use, during deliberations, to test the witness's accuracy while the witness was testifying. State v. Fisher, 165 Wn.2d 727, 752, 202 P.3d 937 (2009).

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. Darden, 145 Wn.2d at 619. Abuse exists when the trial court's exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons. Id. Similarly, a court's limitation of the scope of cross-examination will not be disturbed unless it is the result of manifest abuse of discretion. Id. However, the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, credibility, or foundational matters. Id.

Here, on cross, Mondragon intended to question Dawson about her and Ridley-James's plans for parenting the child and moving to Japan:

> Q. Okay. Let's talk about Mr. Ridley's background.
> MS. CONNOR: Objection, relevance.
> MR. RANSOM: Oh, it -- it's relevant, Your Honor.
> THE COURT: How is it relevant?
>
> . . . .
>
> (The following proceedings were had outside the hearing and presence of the jury):

4

. . . .

MR. RANSOM: Here is where it's relevant, Your Honor. Here is my offer of proof. I want to know if there is some kind of discussions about Mr. Ridley's plans to move to Japan.

. . . .

MR. RANSOM: The offer of proof is this. I think that Mr. Ridley has spoke [sic] to her about his plans to move to Japan. I think she knows about his education, his background that he speaks fluent, that he has been there before, I think she knows that Mr. Ridley wants to take custody of the child. All of this is relevant background information which goes to credibility. . . .

. . . .

MS. CONNOR: One, I think it's calling for hearsay answer. . .

MR. RANSOM: If I may. If it is hearsay, then there is an exception to the hearsay rule of present sense impression and that's the exception that I'm seeking here if the court finds that their conversations in the regard that I spoke to you about.

Then, counsel assented that Ridley-James would be a better witness to ask, stating, "I believe I'm inclined to ask these questions of Mr. Ridley[-James], that would probably be a better person to ask rather than hearsay from Ms. Dawson, so if the court instructs me to stop asking questions." At which point the court sustained the State's objection.

Now, Mondragon argues that Dawson's testimony would fall under the state of mind exception to hearsay. ER 803(a)(3), is a hearsay exception for a statement of the declarant's then existing state of mind.[2] State v. Marintorres, 93 Wn. App.

---

[2] To be admissible on this theory, the hearer's state of mind must be relevant to an issue at trial. See Marintorres, 93 Wn. App. at 449. The effect on Dawson of Ridley-James's statements about his intentions for parenting the child was not relevant to an issue at trial.

442, 449, 969 P.2d 501 (1999). Error in the exclusion of testimony by a trial court generally cannot be urged under a theory presented for the first time on appeal. Allen v. Asbestos Corp., Ltd., 138 Wn. App. 564, 578, 157 P.3d 406 (2007). See also RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). Thus, because Mondragon did not raise the state of mind hearsay exception before the trial court, we need not consider this argument on appeal.

Mondragon also argues the trial court abused its discretion when, on relevance grounds, it limited this line of questioning to Ridley-James. The court sustained the State's relevance objection when defense counsel asked Ridley-James, "Have you made any long-term plans with Ms. Dawson?" But, the court allowed defense counsel to question Ridley-James about his plans for parenting of his daughter. Counsel asked if he had sought "custody" of his daughter, and if he would prefer to have "full custody" of her. The court overruled the State's objection to the latter question.

A defendant has a right to confront the witness against him with bias evidence so long as the evidence is at least minimally relevant. Fisher, 165 Wn.2d at 752. But, a defendant has a right to put specific reasons motivating the witness's bias before the jury, not specific facts. See id. at 752-53. In Fisher, our Supreme Court upheld the trial court's decision to exclude evidence of financial details of a dissolution of marriage where it allowed testimony about the nature of the dissolution and whether the witness harbored ill will toward the defendant. See id. at 753.

Here, the court allowed defense counsel to question Ridley-James about his intentions for parenting the child, to establish any possible bias Ridley-James might have towards Mondragon. Mondragon does not explain how Ridley-James's future plans with Dawson were relevant, beyond witness's possible bias, which trial counsel explored through other questions. The trial court did not abuse its discretion in limiting the scope of questioning by excluding the question to Ridley-James about his long-term plans with Dawson.

B. Confrontation Clause Rights

Second, Mondragon argues that allowing Deputy Weatherby to testify that the testimony of Dawson and Ridley-James was consistent with the statements of witnesses at the scene was error. She argues that the testimony about the absent witnesses' statements violated her right to confrontation.

Under the Sixth Amendment's confrontation clause, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. State v. Chambers, 134 Wn. App. 853, 860, 142 P.3d 668 (2006). Admission of a testimonial statement violates a defendant's right of confrontation unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness regarding the statement. Id. Statements are testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. State v. Mason, 160 Wn.2d 910, 918-19, 162 P.3d 396 (2007). Confrontation clause claims are reviewed de novo. Id. at 922.

In Crawford v. Washington, citing three-decade old precedent, the United States Supreme Court reiterated that, "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Eight years later—in plurality, concurring, and dissenting opinions—all nine Justices continued to adhere to this view. Williams v. Illinois, 567 U.S. 50, 57, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion). In a four-justice plurality opinion, Justice Alito repeatedly discusses this limitation on the confrontation right, first observing that "this statement was not admitted for the truth of the matter asserted, and it is settled that the Confrontation Clause does not bar the admission of such statements." Id. The plurality repeats this principle, "We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." Id. at 57-58. This was later again repeated. Crawford, Justice Alito wrote, "took pains to reaffirm the proposition that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" Id. at 70 (quoting Crawford, 541 U.S. at 59-60 n.9).

Justice Thomas, who possesses a singular view of the confrontation clause, concurred in the judgment but agreed with the foregoing limitation: "As the Court has explained, '[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"

8

Williams, 567 U.S. at 104 (Thomas, J., concurring) (alterations in original) (quoting Crawford, 541 U.S. at 60 n.9). That makes five justices who shared this view.

The other four justices, although in dissent, shared it also. Id. at 125 (Kagan, J., dissenting). There is, the dissenters noted, "[A] limit to the Confrontation Clause recognized in Crawford. 'The Clause,' we cautioned there, 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " Id. (Kagan, J., dissenting) (quoting Crawford, 541 U.S. at 59-60 n.9)."

Thus, a unanimous United States Supreme Court opined that the confrontation clause applies only to statements offered to prove the truth of the matter asserted. Following binding United States Supreme Court precedent, we hold the challenged testimony was not offered to prove its truth and, therefore, is not subject to a confrontation clause challenge.

Initially, citing Crawford, the Washington Supreme Court recognized this authority, "[E]ven testimonial statements may be admitted if offered for purposes other than to prove the truth of the matter asserted." State v. Davis, 154 Wn.2d 291, 301, 111 P.3d 844 (2005), aff'd by Davis v. Wasington, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). However, two years later, our Supreme Court took a contrary view: "[W]e are not convinced a trial court's ruling that a statement is offered for a purpose other than to prove the truth of the matter asserted immunizes the statement from confrontation clause analysis. To survive a hearsay challenge is not, per se, to survive a confrontation clause challenge." Mason, 160 Wn.2d at 922. In the six years since the United States Supreme Court decided the

Williams case, the Washington Supreme Court has not disavowed its contrary holding in Mason. Thus, we must decide this case on alternative bases.

On redirect, the State asked Deputy Nicholas Weatherby about his questioning of other people who were present at the woodshop the day of the incident. Weatherby stated that he spoke to A.C. and Jule.[3] He stated that he spoke to A.C. and Jule after Ridley-James and Dawson, explaining, "I usually speak with the people reporting the crime or the victim in an investigation first and get the details and then I speak to the witnesses to see if their observation was consistent with what I'm being told by the other individuals." Mondragon objected when the State asked Weatherby, "What key details did A[.]C[.] and Jule tell you that were consistent?" In response to the Mondragon's objection, the State told the court,

> Counsel opened the door as to statements being consistent or inconsistent, also suggested they weren't here and he didn't take a written statement. I'm asking this witness to clarify what he means by consistent and the key details and to explain what he did further on in the investigation.

The court allowed the question for "that limited purpose but not to establish the truthfulness of the statements of the individuals questioned."

Recounting the statements A.C. and Jule gave him, Deputy Weatherby testified,

> The observations they made as far as what they saw claiming that [Mondragon] attacked [Dawson] and struck her in the face several

---

[3] Weatherby described A.C. as a "teenage friend" and Jule as Ridley-James's father. A.C. Charles is Ridley-James's cousin and Jule James is Ridley-James's stepfather, and is often referenced as Ridley-James's father in the report of proceedings.

10

times and then [Ridley-James] had to physically pull her off of [Dawson] and hold on to her in order to keep her from continuing to assault her was the same.

They also said --I can't remember if they said they observed or just heard the argument. I spoke with them both at the same time, so I can't at this, a year later, I can't tell you the exact words but I do remember they were consistently the same as what I was being told by [Dawson] and by [Ridley-James].

A.C. and Jule gave statements to Weatherby after the incident, when there was not an ongoing emergency, during the course of the police investigation. See Mason, 160 Wn.2d at 918-19 (statements are testimonial when there is no ongoing emergency and the primary purpose of the interrogation is to establish relevant events to later prosecution). The trial court admitted the testimonial statements not for the truthfulness of the individuals questioned. Under Williams, the admission of the evidence did not violate the confrontation clause. See 567 U.S. at 57.

And, even if under Mason any confrontation clause error occurred, it is subject to harmless error analysis. State v. Watt, 160 Wn.2d 626, 633, 160 P.3d 640 (2007). Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. Id. at 635. A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Id. The appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. Id. at 636.

11

Here, Dawson had already testified that Mondragon hit her in the face with her fist. And, Ridley-James had testified that Mondragon "struck [Dawson] repeatedly in the face with her right hand" and that "[Dawson] did nothing but try to cover her face as [Mondragon] repeatedly struck her in the nose." Further, Weatherby testified on direct, without objection, that Mondragon had admitted to assaulting Dawson,

Q. And were you able to contact [Mondragon] when you arrived?

A. I was. When I arrived, . . . we parked. There is a parking lot to our right and she was outside of a vehicle standing I believe in front of Lummi police vehicle and a couple of Lummi officers were speaking with her so I approached them and interviewed her.

Q. Did she agree to talk with you?

A. She did.

Q. What did she tell you?

A. When I first walked up to her, I believe I introduced myself and, . . . I asked an intentional open-ended question of what happened here today and what she said in reply was -- it still sticks out in mind as being usual [sic] -- the first words out of her mouth were "I punched the bitch in the face."

Q. What did you say to that?

A. I asked more clarifying questions about why she did that and what the circumstances were leading up to that.

Q. And what did she tell you?

A. She said she had -- she had responded to the property to talk to Michael about something. . . . And when she showed up, she immediately recognized [Dawson] because she had previously seen her pictures on some kind of social media and was under the impression that [Ridley-James] possibly had cheated on her with [Dawson] while they were still dating. [S]he said what she saw her [sic], she felt blind-sided by that and that kind of made her lose control of herself and very angry.

12

. . . .

Q.  Now while you were talking to her about what happened, did she report that the altercation was a fight?

A.  Yes. . . . I am not sure if she used the exact word fight.

Q.  How did she describe it?

A.  She described it more as she kind of blind-sidedly [sic] attacked [Dawson]. She said she lost control and went into a rage were her words.

Q.  Did she complain of being attacked by [Dawson]?

A.  No. I asked and she said [Dawson] did not fight back to [her] knowledge.

Even if the jury could have viewed Dawson and Ridley-James testimony with skepticism, Officer Weatherby testified that Mondragon admitted to the assault. There was no evidence that challenged Mondragon's confession. Mondragon did not testify. As in Watt, even without the evidence of the additional witnesses' statements that is being challenged here, the untainted evidence would have allowed any reasonable jury to find beyond a reasonable doubt that Mondragon assaulted Dawson and struck her in the nose.

If the trial court erroneously admitted Weatherby's statement, we find that the error is nonetheless harmless.

C.  Ineffective Assistance of Counsel

Third, Mondragon argues on appeal she received ineffective assistance of counsel, based on matters contained within the record.[4] She argues that trial counsel was ineffective by cross-examining Dr. Yost Knops and demonstrating to

---

[4] Mondragon argues that she received ineffective assistance of counsel on matters outside of the record in her personal restraint petition.

the State that it had not established the cause of Dawson's nose injury. Further, she asserts that if trial counsel had not cross-examined Dr. Knops, there is a reasonable possibility that she could have prevailed on a motion to dismiss the charge of second degree assault, leaving the fourth degree assault charge. Then, she argues trial counsel was ineffective by advising her not to testify when the defense theory was self-defense.

In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate (1) deficient performance, that her attorney's representation fell below the standard of reasonableness, and (2) resulting prejudice, that, but for the deficient performance, the result would have been different. See State v. Hassan, 151 Wn. App. 209, 216-17, 211 P.3d 441 (2009). If a defendant fails to establish either prong, we need not inquire further. Id. at 217. To establish deficient performance, the defendant has the heavy burden of showing that her attorney made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Id. This court approaches an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). The defendant has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. Hassan, 151 Wn. App. at 217. The extent of cross-examination is a matter of judgment and strategy. State v. Jonhston, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). This court will not find ineffective assistance of

counsel based on trial counsel's decisions during cross-examination if counsel's performance fell within the range of reasonable representation. Id.

Mondragon claims her counsel was ineffective when he cross-examined Dr. Knops. She asserts that defense counsel's cross examination established that (1) Knops did not know how Dawson received the injury, and (2) did not see how she received the injury, (3) there are many causes of a broken nose, and (4) Dawson's breathing was slightly affected by the injury. She asserts that this was after the State had failed to elicit from Knops how Dawson had broken her nose, and implies that the cross-examination elevated her charge from fourth degree assault to second degree assault.

Here, as the State notes, there is nothing in the record to show that it was defense counsel's questioning that prompted the prosecutor to ask Dr. Knops about what Dawson had said. On redirect, the State asked Dr. Knops, "For purposes of medical diagnosis and treatment, do you ask the patient what happened?" This testimony is admissible under ER 803(a)(4), statements for purposes of medical diagnosis. Defense counsel's cross-examination of Knops included,

Q. Let's discuss what you did not witness or know.

A. Okay.

Q. You don't know the background of how Ms. Dawson received her injury?

A. Correct.

Q. You did not see how she suffered the injury?

A. I was not there.

Q. All you know is what Ms. Dawson told you about how she received that injury.

A. That's correct.

From these questions, we conclude that defense counsel's strategy was to establish the limits of the doctor's knowledge. Whether this was a particularly helpful inquiry is doubtful. But, this questioning was not necessary for the State to establish the nexus between the assault and the injury treated.

Witness testimony already had been given which allowed the State to argue that Mondragon's assault caused Dawson's injury. Dawson testified that after the incident, when the police finished questioning her, she went to the emergency room for medical treatment. She testified that the emergency room referred her to the ear, nose, and throat specialist, who later diagnosed her injury as a nose fracture. On direct, Dr. Knops testified that Dawson's injury was a nasal fracture, and that the nose was displaced and moved. He stated a nose will become disaligned or displaced if there is any type of force applied to it. And, that this can happen from fists, softballs, stray elbows, car accidents, or anything that strikes the nose. Dawson's direct testimony established a sufficient nexus between her injury and the diagnosis of a fracture. And, Dr. Knops's direct testimony established that Dawson's injury was consistent with the alleged assault. Thus, the link was established, from which the State could argue that Mondragon's assault caused Dawson's injury without the testimony elicited on redirect. Counsel's performance in cross-examining Knops falls within the reasonable range of representation.

Mondragon next claims that her counsel was ineffective by advising her not to testify when the theory of the defense was self-defense. Mondragon states in her brief that "it is clear that trial counsel did advise Ms. Mondragon not to testify."

A defendant who is able to prove that his attorney actually prevented him from testifying has satisfied the first step in the ineffective assistance of counsel test under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See State v. Robinson, 138 Wn.2d 753, 766, 982 P.2d 590 (1999). And, to satisfy the second prong of ineffective assistance, the defendant must prove that his testimony would have a reasonable probability of affecting a different outcome. See id. at 769-70.

Mondragon does not cite to anywhere in the record to support her assertion that trial counsel prevented her from testifying. Therefore, she has not proven in her direct appeal that she received ineffective assistance of counsel.

## II.  Personal Restraint Petition

In the personal restraint petition, Mondragon contends that errors require this court to vacate her conviction and remand for a new trial, or at least remand for an evidentiary hearing. She argues that she was denied effective assistance of counsel when counsel advised her not to testify. She asserts that this caused counsel to forsake the only viable defense in this case, self-defense, and proceed with general denial. And, she asserts that cumulative errors, of the trial court and trial counsel, denied her the right to a fair trial.

A. Standard of Review

A personal restraint petitioner must prove either a constitutional error that results in actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect which inherently results in a complete miscarriage of justice. In re Pers. Restraint of Monschke, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). The burden is on the petitioner to prove the error by a preponderance of the evidence. Id. A petitioner claiming ineffective assistance of trial or appellate counsel necessarily establishes actual and substantial prejudice if the petitioner meets the standard of prejudice applicable on direct appeal. In re Pers. Restraint of Lui, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To prevail, the petitioner must prove that but for counsel's deficient performance there is a reasonable probability the outcome would have been different. Id.

The petitioner must state in his petition the facts underlying the claim of unlawful restraint and the evidence available to support the factual allegations. In re Pers. Restraint of Rice, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). Bald assertions and conclusory statements are not sufficient to entitle the petitioner to a reference hearing. Id. at 886. If allegations are based on matters outside the record, the petitioner must demonstrate that competent, admissible evidence would establish the facts. Id. And, if the allegations are based on the knowledge of others, the petitioner must present their affidavits or other corroborative evidence. Id. If the petitioner makes this threshold showing, the court examines the State's response, which should identify any material disputed questions of fact.

Id. If there are material disputed issues of fact, then the trial court will be directed to hold a reference hearing to resolve the factual questions. Id. at 886-87.

B. Right to Testify

Mondragon asserts that she received ineffective assistance of counsel because she wished to testify and was functionally prevented from doing so. Pet. In support of this argument, Mondragon provides her own declaration and the declaration of her trial counsel, Alexander Ransom.

A defendant has a fundamental constitutional right to testify in his or her own defense. Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). This right is protected at a federal level by the Fifth, Sixth, and Fourteenth Amendments. Id. The Washington constitution explicitly protects the right to testify. WASH. CONST. art. I, § 22. This fundamental right cannot be abrogated by counsel or the court. Robinson, 138 Wn.2d at 758. Only the defendant, not counsel, has the authority to decide whether or not to testify. State v. Thomas, 128 Wn.2d 553, 558, 910 P.2d 475 (1996). A defendant's right to testify is violated if the final decision that the defendant would not testify was made against his will. Robinson, 138 Wn.2d at 763.

In order to prove that an attorney actually prevented the defendant from testifying, the defendant must prove that the attorney refused to allow him to testify in the face of unequivocal demands that he be allowed to do so. Id. at 764. When a defendant proves that his attorney actually prevented him from testifying, we address the appropriate remedy as a claim of ineffective assistance of counsel under Strickland. Id. at 765-67. To succeed on a claim of ineffective assistance

19

of counsel, a defendant must show (1) that counsel's representation was deficient in that it fell below an objective standard of reasonableness, and (2) this deficient representation prejudiced the defendant, meaning that there is a reasonable probability that the result of the proceeding would have been different absent counsel's errors. McFarland, 127 Wn.2d at 334-35; Strickland v, 466 U.S. at 687-88.

While the decision to testify should ultimately be made by the client, it is entirely appropriate for the attorney to advise and inform the client in making the decision to take the stand. Robinson, 138 Wn.2d at 763. In Robinson, the court noted that we must distinguish cases in which the attorney actually prevents the defendant from taking the stand, from cases in which counsel merely advises the defendant against testifying as a matter of trial tactics. Id. If the defendant cannot prove by a preponderance of factual evidence that counsel ignored his unequivocal demands to testify, we will presume that the defendant voluntarily elected not to take the stand upon the advice of counsel. Id. at 764.

Here, Mondragon states,

> After I hired Mr. Ransom, I told him about what happened and we planned to plead self-defense at trial. I told Mr. Ransom shortly after I retained him as my attorney that there were Skype messages from before the incident in which I called Ms. Dawson foul names. I did not have copies of them as they had been deleted.

> From the beginning, I had planned to testify. After the prosecutor gave Mr. Ransom the Skype messages, he and I spoke again about me testifying. Mr. Ransom said that the Skype messages were really incriminating. He said, "I can't give you a good opinion as to whether to testify". [sic] The prosecutor is going to nail you to the cross with these. He advised me not to testify. I knew it was my decision, but I trusted my lawyer's advice.

Mondragon's trial defense counsel describes his trial tactics, in part,

> It was always Ms. Mondragon's and my intention that we would advance the defense of self-defense at trial. I gave written notice of that intent to the court and the State. . . . Several days into trial, the prosecutor, Ms. Connor, gave me documents that would later be marked as Exhibits 24 and 25. Those documents were copies of Skype messages between my client, Ms. Mondragon and the alleged victim, Ms. Dawson sent before the incident in question. Exhibits 24 and 25 speak for themselves. . . . I felt that if I moved forward with self-defense and had Ms. Mondragon testify despite those messages, then the State would have (1) admitted the text messages under ER 404(b) as proof of motive, intent, etc.; and/or (2) admitted the messages as business records or other hearsay exceptions; and/or (3) admitted [11 Washington Patter Jury Instructions: Criminal] 16.04[, at 253 (4th ed. 2016) (WPIC),] to show that Mondragon, and not Dawson, was the true and primary aggressor. They contained, among other things, threats by Ms. Mondragon towards Ms. Dawson. . . . I advised Ms. Mondragon not to testify. What I recall of the conversation is that (1) if she testified, she risked being be cross-examined by the Prosecution regarding the comments she made on Skype to Ms. Dawson, and (2) perhaps we could move forward with a "lack of evidence" and "lack of victim credibility" defense in lieu of Ms. Dawson's role in essentially breaking up Ms. Mondragon's family; the odd facts surrounding the actual assault itself and our wilting self-defense defense. Ms. Mondragon accepted my advice that she should not testify. Ms. Mondragon did tell me that she was afraid of being injured by Ms. Dawson when she struck her. The reason I did not consider the path of Ms. Mondragon acknowledging that she sent the messages contained in Exhibits 24 and 25 — and then arguing that because she had sent these to Ms. Dawson, she was afraid of being assaulted by Ms. Dawson when she approached Ms. Mondragon — was because the State would have submitted WPIC 16.04 as an "Aggressor" instruction which would have nullified Ms. Mondragon's a self-defense defense.

Defense counsel's advice to Mondragon not to testify was a reasonable trial tactic, given the nature of the Skype messages. Further, Mondragon states in her declaration that her counsel advised her not testify based on these messages, and that she "knew it was her decision."

21

Unlike Robinson, Mondragon has not raised specific facts to create a credible allegation that she was prevented from testifying. See 138 Wn.2d at 760. Mondragon elected not to take the stand upon advice from counsel. The affidavits do not establish by a preponderance of evidence that he prevented her against her will from testifying. Thus, Mondragon has failed to allege facts that show counsel's performance was deficient. We need not consider both prongs of Strickland (deficient performance and prejudice) if a petitioner fails on one. See In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). We deny her claim of ineffective assistance of counsel.

Appelwick

WE CONCUR:

Leach, J.

Dwyer, J.