IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81390-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID GARRETT MICHAEL THOMAS, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — David Garrett Michael Thomas argues that there is insufficient evidence to support his jury convictions for attempted first degree assault while armed with a deadly weapon and second degree assault while armed with a deadly weapon and that the court improperly allowed impeachment evidence. In a statement of additional grounds, he also asserts evidentiary errors, prosecutorial misconduct, and cumulative error. Because sufficient evidence supports Thomas' convictions, he fails to identify any evidentiary error, and the prosecutor did not commit misconduct, we affirm.

FACTS

Thomas and Syreeta Funk dated for about three years. The relationship ended in May 2016 after an incident that led to a court order prohibiting Thomas from contacting Funk. Despite the no-contact order, Funk and Thomas remained friends.

Citations and pin cites are based on the Westlaw online version of the cited material.

Close to midnight on May 12, 2017, Thomas called Funk asking for her help. He was "really depressed" and "wanted support." Because of the restraining order, Funk was reluctant to meet Thomas. But "he was really cold" and she had some of his clothing, so she agreed to "help him out by bringing him his clothes."

They met in an empty parking lot with no lights. Thomas got into Funk's car and would not leave. He was despondent, not taking his mental health medication, and "very suicidal." Funk drove to a nearby well-lit gas station, parked and exited her car, and called 911 to report Thomas for violating the no-contact order.

Several Vancouver Police Department officers arrived at the gas station, including Officer Branden Schoolcraft, Officer Sean Suarez, Officer Kathryn Endresen, and Officer Trent Harris. Thomas got out of Funk's car and began walking across the gas station parking lot and away from the police officers. The officers identified themselves as the police and shouted for Thomas to stop. Thomas turned around and faced the officers but continued walking backward. He told the officers, "I didn't do anything, what do you want," as he backed away.

When Thomas reached the curb of a main road, he assumed a "bladed" or "boxer" stance with his fists clenched. Thomas "was flexing" and "yelling" at the officers to "come on." In the poor lighting, Officer Schoolcraft noticed something black in Thomas' right hand, which he described as similar to "one of the large [S]harpie type markers."[1]

---

[1] "Sharpie" is a brand of permanent markers, pens, and highlighters.

The officers concluded that Thomas would not submit to arrest. Officer Suarez tased Thomas "but it didn't have any effect." Officer Schoolcraft tried to grab Thomas' left arm. Thomas "punched" Officer Schoolcraft in the nose, which made a "pop" sound and began pouring blood. Officer Schoolcraft did his best to hold onto Thomas' left side while Officer Suarez tried to grab Thomas from the front. Officer Endresen tried to grab Thomas from the right. Thomas was "throwing punches" and "actively trying to pull away and basically get free."

The struggle moved from the curb into the middle of the "major roadway[ ]." Officer Harris ran toward the fight, lifted Thomas' leg off the ground to throw him off balance, and "the whole group fell to the ground." Thomas continued to punch and fight. Officer Schoolcraft executed a "[carotid] restraint,"[2] rendering Thomas momentarily unconscious. The officers began placing handcuffs on Thomas. But Thomas regained consciousness before they could secure the handcuffs and the struggle continued. The officers eventually succeeded in handcuffing Thomas and ending the altercation.

After the officers handcuffed Thomas, Officer Suarez saw a folding knife lying open on the street next to the location of the struggle. The knife was black with a three-inch blade. None of the officers were missing their knives. According to Officer Schoolcraft, the knife looked like the black item he saw in Thomas' hand that he thought was a large permanent marker.

Officer Schoolcraft went to the hospital for examination of his nose, which was broken. On his way to meet Officer Schoolcraft at the hospital, Officer

---

[2] "Carotid restraint" is a technique where bilateral pressure applied to arteries temporarily restricts blood flow to the brain, leading to unconsciousness.

Suarez noticed a "sharp pain" in his left arm. He showed his arm to Officer Schoolcraft, who found a cut in Officer Suarez's uniform and "a small puncture followed by a cut" on his arm. Officer Suarez looked in the mirror and saw a "big cut" in his uniform shirt and "a small puncture wound" and cut on his arm. The wound appeared to be a stab wound. Officer Schoolcraft then examined his vest and discovered a cut through his police patch that had not existed before the altercation with Thomas.

The State charged Thomas with attempting to assault Officer Schoolcraft in the first degree while armed with a deadly weapon—"to wit: a knife"—and assaulting Officer Suarez in the second degree while armed with a deadly weapon—a knife.[3] Thomas asserted he was not guilty by reason of insanity. Thomas claimed that he has suffered from severe mental illness since his teenage years. He was diagnosed with schizoaffective disorder and has tried "a lot" of medications to manage his illness.

A jury found Thomas guilty as charged. The court imposed a high-end standard-range sentence, including deadly weapon enhancements.

Thomas appeals.

ANALYSIS

Sufficiency of the Evidence

Thomas challenges the sufficiency of the evidence underlying his convictions for attempted first degree assault of Officer Schoolcraft while armed

---

[3] The State also charged Thomas with third degree assault of Officer Endresen while armed with a deadly weapon as well as violation of a domestic violence court order. Thomas does not raise any issues as to these charges.

with a deadly weapon and second degree assault of Officer Suarez while armed with a deadly weapon.

The principles of due process require the State to prove every element of a crime beyond a reasonable doubt. State v. Cantu, 156 Wn.2d 819, 825, 132 P.3d 725 (2006). "Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). In reviewing a claim of the sufficiency of the evidence, we draw all reasonable inferences from the evidence in the State's favor. State v. Cardenas-Flores, 189 Wn.2d 243, 265-66, 401 P.3d 19 (2017). We consider circumstantial and direct evidence equally reliable. Cardenas-Flores, 189 Wn.2d at 266. But we "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." Thomas, 150 Wn.2d at 874-75.

Attempted Assault in the First Degree

The State charged Thomas with attempting to assault Officer Schoolcraft in the first degree while armed with a knife. For an attempt crime, the State must prove beyond a reasonable doubt that "with intent to commit a specific crime," Thomas performed an act "which is a substantial step toward the commission of that crime." RCW 9A.28.020(1); State v. Nelson, 191 Wn.2d 61, 71, 419 P.3d 410 (2018). "A substantial step is an act that is 'strongly corroborative' of the actor's criminal purpose." State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2012) (quoting State v. Luther, 157 Wn.2d 63, 78, 134 P.3d 205 (2006)). "Any

5

slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime." State v. Price, 103 Wn. App. 845, 852, 14 P.3d 841 (2000).

Here, the State must prove that Thomas' actions were a substantial step toward committing the crime of first degree assault. A person commits first degree assault when "with intent to inflict great bodily harm," he assaults another with a "deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a).

Thomas argues the State failed to prove beyond a reasonable doubt that he used a deadly weapon during the struggle with the officers. Specifically, he contends the record contains "no direct evidence" that he used a knife to assault Officer Schoolcraft. But the record includes significant circumstantial evidence that Thomas brandished a knife.

Officer Schoolcraft testified that Thomas held something black in his hand. Later, Officer Suarez found a black folding knife lying open on the ground near the struggle. The knife did not belong to any of the officers. And Officer Schoolcraft testified that the knife resembled the black object he saw in Thomas' hand. Finally, Officer Sanchez had a wound consistent with a knife wound and both Officer Schoolcraft and Officer Sanchez had cuts in their uniforms that were not present before the struggle with Thomas. Viewing the evidence in the light most favorable to the State, a reasonable juror could find beyond a reasonable doubt that Thomas possessed and used a deadly weapon in his attempt to assault Officer Schoolcraft.

6

Thomas also argues the State failed to prove that he intended to inflict great bodily harm on Officer Schoolcraft. "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). First degree assault requires "specific intent," or "intent to produce a specific result." State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). "Specific intent cannot be presumed, but it can be inferred as a logical probability from all the facts and circumstances." State v. Wilson, 125 Wn.2d 212, 217, 883 P.2d 320 (1994). Circumstantial and direct evidence apply equally in proving intent. State v. Johnson, 188 Wn.2d 742, 763, 399 P.3d 507 (2017).

The evidence at trial showed that Thomas at first walked away from the officers. He then turned to face them, assumed a fighting stance, and "screamed," "[C]ome on." Officer Schoolcraft saw a black object in Thomas' hand. After the altercation, Officer Suarez found an open folding knife on the ground nearby. Officer Schoolcraft testified that the black object he first saw in Thomas' hand also "resemble[d]" "a knife that would have been closed." A reasonable juror could infer from these facts and circumstances that Thomas confronted officers with a closed knife, opened the knife, and tried to use the knife to inflict harm on Officer Schoolcraft. Sufficient evidence supports Thomas' specific intent to inflict great bodily harm.

Assault in the Second Degree

The State charged Thomas with assaulting Officer Suarez in the second degree while armed with a knife. To prove assault in the second degree, the

7

State must show that Thomas assaulted Officer Suarez "with a deadly weapon." RCW 9A.36.021(1)(c). Thomas again claims the State failed to present sufficient evidence that he used a deadly weapon.

As discussed above, the circumstantial evidence is sufficient to show that Thomas used a knife during the altercation. Officer Suarez had a puncture wound and small cut in his left arm after the struggle with Thomas and found a cut in his uniform that was not there before the incident. Viewed in the light most favorable to the State, a reasonable juror could conclude that Thomas assaulted Officer Suarez with a deadly weapon.

<u>Impeachment Evidence</u>

Thomas contends the trial court abused its discretion by admitting jail telephone calls with Funk because they were extrinsic evidence offered to impeach Funk on a collateral matter. We review a trial court's decision to admit or exclude evidence for abuse of discretion. <u>State v. Gunderson</u>, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). A trial court abuses its discretion when a decision is manifestly unreasonable or based on untenable grounds or reasons. <u>Gunderson</u>, 181 Wn.2d at 922.

Funk testified extensively at trial. Much of her testimony was favorable toward Thomas. She talked at length about Thomas' mental health, a major issue at trial and crucial to his insanity defense. On cross-examination, Funk said that she had not spoken to Thomas "recently." Yet the State had obtained recorded jail telephone calls of Funk speaking to Thomas a few days before the start of trial. In those calls, Funk expressed her love and support for Thomas.

8

The State moved to admit the calls to show Funk's "bias and motive" in favor of Thomas. The trial court admitted the evidence.

Extrinsic evidence cannot be used to impeach a witness on a collateral issue. State v. Lubers, 81 Wn. App. 614, 623, 915 P.2d 1157 (1996). But cross-examination to expose bias is not impeachment on a collateral matter. See State v. McDaniel, 37 Wn. App. 768, 772, 683 P.2d 231 (1984). The State clearly offered the recordings of Funk expressing her personal feelings and support for Thomas as evidence of her bias. The trial court did not err in admitting the evidence.

Statement of Additional Grounds

Thomas raises several claims in his statement of additional grounds for review, including evidentiary errors, prosecutorial misconduct, and cumulative error.

### Evidence of Prior Crimes

Thomas contends the trial court erred in admitting evidence of his prior crimes. We review evidentiary rulings for abuse of discretion. State v. Halstien, 122 Wn.2d 109, 126, 857 P.2d 270 (1993). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. State v. Vars, 157 Wn. App. 482, 494, 237 P.3d 378 (2010).

Evidence of prior convictions is generally inadmissible as propensity evidence. ER 404(b). However, "[a] party may open the door to otherwise inadmissible evidence by introducing evidence that must be rebutted in order to

preserve fairness and determine the truth." State v. Wafford, 199 Wn. App. 32, 36-37, 397 P.3d 926 (2017).

During direct examination, Thomas testified, "Aside from being arrested, I have never in my life have ever been assaultive, at the very least been disrespect[ful] to any authority figure. I mean—I mean to any police officer." On cross-examination, the State moved to admit evidence of Thomas' prior convictions, including the 2016 fourth degree assault of Funk that led to the no-contact order and a 2013 third degree assault conviction for "breaking a man's nose." The State argued that Thomas "opened the door" to this evidence. The trial court admitted the evidence, concluding:

> [B]ecause he's indicated that at least although he's, at the end, modified [his testimony] with authority figures, the direct impression he was trying to create was that he wasn't a violent person and so he's opened the door for instance[s] where he was violent in the past.

Thomas' statement that he has "never" been assaultive opened the door to this otherwise inadmissible evidence. The trial court did not abuse its discretion by admitting the evidence.

Opinion on Mental Illness

Thomas contends the trial court allowed Officer Schoolcraft to offer an improper lay opinion about Thomas' mental health in violation of ER 701 and 702. He argues that Officer Schoolcraft's testimony amounted to an opinion on the ultimate issue in his case because mental health was the "core element" of his defense.

We review evidentiary rulings for abuse of discretion. Halstien, 122 Wn.2d at 126. Lay witnesses may testify as to opinions "which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." ER 701. A witness may not offer an opinion on the guilt or veracity of the defendant because it is unfairly prejudicial and invades the exclusive province of the jury. State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). But "otherwise admissible" opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704.

The State questioned Officer Schoolcraft about his observations of Thomas at the time of the incident. Officer Schoolcraft testified about his formal training in identifying signs of mental illness and whether he observed Thomas display conduct consistent with mental illness during his struggle with police. For example, the prosecutor asked Officer Schoolcraft whether Thomas appeared "confused" or "unaware of what was happening" and whether Thomas was "speaking to himself" or making "bizarre statements." The prosecutor asked Officer Schoolcraft if he had "occasion to come into contact with people who were exhibiting signs of mental illness or who appear psychotic" while working as a police officer. Officer Schoolcraft answered, "Frequently, yes." He then testified that he did not observe any behavior consistent with mental illness during his interaction with Thomas.

Thomas bore the burden of establishing the defense of insanity by a preponderance of the evidence. RCW 10.77.030(2); State v. Carneh, 153 Wn.2d 274, 282, 103 P.3d 743 (2004). Thomas offered the expert testimony of clinical and forensic psychologist Dr. Alexander Duncan in support of his insanity defense. Dr. Duncan testified extensively about Thomas' mental health history and current diagnoses. Dr. Duncan testified that whether Thomas was criminally insane during the incident is "ultimately the jurors['] determination," but in his opinion, Thomas was experiencing "acute and consuming" symptoms of schizoaffective disorder at the time of the incident, including hallucinations, depression, and psychosis. Thomas' behavior at the time of the incident was an important factor Dr. Duncan considered in rendering his opinion that Thomas was "hallucinating at the time of . . . these offenses," presenting symptoms of schizoaffective disorder, and "acutely psychotic" and that Thomas' mental state "fueled his behavior" of not appreciating "the risk he was putting towards officers or himself."

The court instructed the jury that to find Thomas not guilty by reason of insanity,

> you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or was unable to tell right from wrong with reference to the particular acts with which the defendant is charged.

Officer Schoolcraft's observations of Thomas' behavior was helpful to the jury in determining whether Thomas was not guilty by reason of insanity. Officer Schoolcraft based his testimony on his training and experience and the testimony

was not predicated on scientific, technical, or specialized knowledge. The testimony was not an improper lay witness opinion.

Prosecutorial Misconduct

Thomas claims the prosecutor violated his right to a fair trial by improperly shifting the burden of proof of the insanity defense and making inflammatory statements about facts not in evidence.

To prove prosecutorial misconduct, Thomas must establish the conduct at issue was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). When, as here, the defendant fails to object at trial, he waives error absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). To prove this level of misconduct, Thomas "must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

We review statements in a prosecutor's closing arguments in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). A prosecutor has wide latitude to draw reasonable inferences from the evidence during closing argument. Boehning, 127 Wn. App.

at 519. "However, a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant." Boehning, 127 Wn. App. at 519.

Thomas claims the prosecutor made comments that improperly placed the burden of proof for the insanity defense on him. But insanity is an affirmative defense, and Thomas bears the burden of establishing the defense of insanity by a preponderance of the evidence. RCW 10.77.030(2); Carneh, 153 Wn.2d at 282. The court instructed the jury on the correct burden of proof. The prosecutor's arguments "that placed the 'burden of proof' on the defense" were not improper.

Thomas also cites several examples of the prosecutor's statements during closing argument that he contends are unsupported by the evidence. These statements mainly pertain to Thomas' use of a knife, such as "the defendant is holding the knife in his right hand"; Thomas "breaks Officer Schoolcraft's nose, tries to stab him, cuts the patch, [and] stabs Suarez in the arm"; and Thomas "has the knife in his right hand . . . [and] flips out the blade at some point." Thomas argues that these statements were improper because no witness or evidence proved he possessed a knife or stabbed an officer.

The prosecutor statements were inferences reasonably drawn from the testimony. Officer Schoolcraft saw an object consistent with a closed folding knife in Thomas' right hand. Later, Officer Suarez found an open folding knife on the ground near the struggle and a stab wound on his arm. Officer Schoolcraft and Officer Suarez also had cuts in their uniforms. Considering the wide latitude

afforded prosecutors during closing argument, these statements were permissible inferences from the evidence.

<u>Cumulative Error</u>

Thomas argues that cumulative error tainted his trial.  The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial.  <u>State v. Weber</u>, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial."  <u>Weber</u>, 159 Wn.2d at 279.  There are no errors to support application of the doctrine in this case.

We affirm Thomas' convictions for attempted assault in the first degree while armed with a deadly weapon and assault in the second degree while armed with a deadly weapon.

Brennan, J.

WE CONCUR:

Appelwick, J.