# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                 Respondent,<br><br>      v.<br><br>CAMRON FICHTNER,<br><br>                 Appellant. | No. 79967-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, C.J. — A jury convicted Camron Fichtner of felony violation of a court order. Fichtner challenges the admission of (1) statements he made to a police officer; (2) evidence about a prior incident of domestic violence involving the victim; and (3) the victim's written statement to the police that was inconsistent with her testimony at trial. He also claims that the prosecutor's misconduct in closing remarks deprived him of a fair trial. We affirm.

## I. FACTS

Ashley Wachs and Fichtner were coworkers who later became involved in an intimate relationship. On the evening of September 9, 2017, Wachs and Fichtner saw each other at a work-related party. Wachs went to the party although she was no

Citations and pin cites are based on the Westlaw online version of the cited material.

longer working for Fichtner's employer and there was a no-contact order in effect at the time, prohibiting contact between her and Fichtner.

Later that night, Caleb Schloss, another coworker, received a series of disturbing Facebook messages from Wachs. She expressed distress, despair, and said she wished she "had a gun" and "never want[ed] to wake up again." Wachs indicated that she had been "hit in the face and kicked on the ground" by Fichtner and suffered an injury to her right eye. Concerned for her safety, Schloss decided to go to Wachs's home. Wachs repeatedly tried to dissuade him from doing so.

When he arrived, Schloss observed redness and "minor bruising" around Wachs's right eye that looked like a "rug burn" and bruising on her right leg. Wachs refused to tell Schloss exactly what happened and seemed to be "trying to just act like everything was ok." Schloss then heard the garage door open and Wachs "frantically" told him to hide. He hid in the master bathroom, locked the door, and called 911.

Schloss heard a male voice he recognized as Fichtner's ask if there was anyone in the house. He heard yelling, and "crashing and banging" that sounded as though a person was being "thrown into stuff around the room." Schloss heard Wachs yell for Fichtner to stop and demand that he leave the house. Schloss also heard Fichtner call his name, while trying to open the bathroom door. Schloss remained on the line with a 911 dispatcher throughout the confrontation.

Deputy Philip James of the Snohomish County Sheriff's Office arrived at Wachs's Lynwood home just before midnight in response to the 911 call. As he approached the house, he heard a female voice from inside yell, "You're crazy. Get the fuck out." Almost immediately after, a male, later identified as Fichtner, emerged from the house.

After speaking to all three individuals, observing Wachs's injuries, and taking other investigative steps, police transported Fichtner to jail. The State later charged him with violation of a court order. The charge was a felony based on the allegation that he violated the court order by assaulting Wachs.

Wachs testified at trial that most of what she told law enforcement officers and Schloss on the night of the incident was not true. Specifically, she claimed that she and Fichtner argued, but that he did not assault her. Wachs said she was "looking for attention" from Schloss. The court admitted the statement she wrote on the night of the incident, in which she indicated that Fichtner had pushed her, dragged her by the ankle, spat at her, and she did not feel "safe." At trial, Wachs explained that she was extremely intoxicated when she wrote the statement and had simply repeated the lies she had already told Schloss.

Deputy James testified that when he asked Fichtner what happened on the night of the incident, he acknowledged the court order. Fichtner said he had contact with Wachs and argued with her, but did not assault her. According to Fichtner, Wachs fell at one point when he tried to walk around her.

The jury convicted Fichtner as charged. Fichtner appeals.

## II. ANALYSIS

Scope of Investigative Detention

Fichtner challenges the trial court's denial of his motion to suppress the statements he made to Deputy James.[1] Fichtner claims that the nature of his detention

---

[1] The court initially held a CrR 3.5 hearing. At that time, both parties took the position that Fichtner's statements were made in response to custodial interrogation, and disputed only whether Fichtner validly waived his Fifth Amendment rights. The court concluded that Fichtner validly waived his rights and his statements were therefore admissible in the State's case-in-chief. A month later, when the

placed it beyond the scope of a lawful investigative Terry[2] stop and his statements were, therefore, the product of an unlawful warrantless arrest.

Generally, warrantless searches and seizures are per se unreasonable. State v. Houser, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). One exception to the warrant requirement is "a brief investigatory detention of a person, known as a Terry stop." State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015). "A Terry stop requires a well-founded suspicion that the defendant engaged in criminal conduct." State v. Doughty, 170 Wn.2d 57, 62, 239 P.3d 573 (2010). If the stop goes beyond investigatory purposes, it becomes an arrest and requires a valid arrest warrant or probable cause. State v. Flores, 186 Wn.2d 506, 520-21, 379 P.3d 104 (2016).

A typical Terry stop includes only a frisk for weapons and brief questioning. State v. Mitchell, 80 Wn. App. 143, 145, 906 P.2d 1013 (1995). But greater intrusion, including "handcuffing, secluding, and drawing guns" may be appropriate and necessary to accomplish investigative purposes in some circumstances. Mitchell, 80 Wn. App. at 145-46. For example, an investigative stop that involved frisking, handcuffing, and transporting the defendant two blocks to the scene of a burglary so a witness could identify the defendant did not rise to the level of an arrest. State v. Wheeler, 108 Wn.2d 230, 235-36, 737 P.2d 1005 (1987). This was so even though the crime under investigation was not violent and there was no indication that the suspect was armed. There is no bright line standard that dictates when the degree of intrusion and force converts an investigative detention into an arrest; but it is generally determined by

---

court heard Fichtner's motion to suppress the same statements under CrR 3.6, the State conceded that when the police officer placed Fichtner in handcuffs, he lacked probable cause to arrest him.
   [2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

whether the officers' fears were reasonable and derived from the particular circumstances. State v. Belieu, 112 Wn.2d 587, 599, 773 P.2d 46 (1989).

"In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions for substantial evidence." State v. Fuentes, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Where, as here, the defendant does not challenge the findings of fact, then we consider them verities on appeal. State v. Bliss, 153 Wn. App. 197, 203, 222 P.3d 107 (2009).

According to the unchallenged findings of fact, Deputy James responded to a "high priority call." By the time he arrived at Wachs's residence, he was aware of the no-contact order, the initial report of a burglary in progress, and updated information indicating an ongoing domestic violence incident. Deputy James was also aware of Fichtner's identity as a suspect and that there was a misdemeanor warrant for his arrest. He knew that the person who called 911 knew Fichtner, had been continuously on the line with the dispatcher, and believed that Fichtner was hurting Wachs. He knew that the dispatch operator heard a female screaming in the background during the call.

Upon his arrival, Deputy James heard a female voice yell from within the house, and then observed a male, who matched the description of the suspect, leave the house. After he confirmed Fichtner's identity, Deputy James placed him in handcuffs and advised him of his rights under Miranda.[3] Deputy James then placed Fichtner in his nearby patrol vehicle. He left Fichtner there with a second police officer, who arrived on the scene just seconds after Deputy James placed Fichtner in handcuffs, standing by.

Based on these findings, the trial court concluded there was a sufficient basis to detain Fichtner and that the investigative detention did not exceed the "proper scope of

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

a <u>Terry</u> stop" in its "nature or duration." The court also concluded that although Deputy James advised Fichtner of his <u>Miranda</u> rights when he placed Fichtner in handcuffs, he had not been required to do so.

Fichtner does not challenge the basis for his detention, but argues that the detention had all of the traditional "hallmarks" of an arrest and his statements were, therefore, the product of an unlawful arrest without probable cause. But Fichtner's argument fails to take into account the specific factual context of the detention or the testimony at the CrR 3.6 hearing. When he arrived at Wachs's residence just before midnight, Deputy James knew that the domestic violence situation was ongoing and believed there were three people inside the house, including one who had been locked in a bathroom. Immediately, the officer heard a female screaming from inside, which corroborated the information that had been reported to him.

Due to safety considerations, the deputy did not plan to enter the residence or attempt to make contact until a backup officer arrived. Deputy James explained that domestic violence situations are "unpredictable and often heated," and that law enforcement officers often sustain injury in the course of responding to them. He said that he placed Fichtner in handcuffs based on safety concerns because he was "the only officer there," and because, partly due to the screaming he heard, he considered that "it was still a heated situation." He believed that he needed to address his and the suspect's safety before continuing to investigate. Deputy James further explained that although Fichtner complied with his initial command to approach, it was still necessary to restrain him because he was alone "in a heated situation" and could not rely on Fichtner's continued cooperation.

The officer's safety concerns were reasonable and related to the specific circumstances he encountered. In view of these concerns, it was reasonably necessary for the police officer to restrain Fichtner with handcuffs and place him in the patrol vehicle while he went inside the residence to investigate.[4] The restraint did not transform the investigative detention into an arrest. The trial court did not err in denying Fichtner's motion to suppress.

Admission of Prior Act of Domestic Violence

Fichtner challenges the trial court's ruling that allowed the State to present testimony about an alleged May 2016 assault, which led to the City of Everett charging Fichtner with fourth degree assault and entry of the court order at issue in this case. We review a court's decision to admit or exclude such evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. Magers, 164 Wn.2d at 181.

ER 404(b) bars the admission of evidence of prior bad acts for the purpose of proving a person's character and showing that the person acted in conformity with that character. State v. Gresham, 173 Wn.2d 405, 420-21, 269 P.3d 207 (2012). But the same evidence may be admissible for another purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice. Gresham, 173 Wn.2d at 420-21. Relevant here, Washington courts have admitted prior acts of

---

[4] As the trial court noted, the record does not indicate how long Fichtner was detained in the patrol car before Deputy James returned to question him. Fichtner makes no argument based on the length of the detention. See State v. Williams, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984) (law enforcement officers exceeded the lawful scope of an investigative detention where instead of questioning the suspect, they detained the suspect for a substantial period and continued the investigation).

domestic violence under ER 404(b) to assist the jury in assessing the credibility of a victim who recants or makes inconsistent statements. See Magers, 164 Wn.2d at 186 (acts of domestic violence admissible to show victim's reasonable fear and to judge credibility of a recanting victim); see also State v. Gunderson, 181 Wn.2d 916, 925, 337 P.3d 1090 (2014) (prior acts admissible when "the State has established their overriding probative value, such as to explain a witness's otherwise inexplicable recantation or conflicting account of events").

Fichtner claims that the trial court's ruling was not consistent with the narrow parameters the Washington Supreme Court's plurality decision in Magers. But a majority of the court in Magers agreed on the admissibility of prior acts of domestic violence in these circumstances where the victim's testimony at trial contradicts prior statements about the defendant's conduct. See Magers, 164 Wn. App. at 186 (lead op.), 195 (Madsen, J. concurring). The trial court's decision in this case to admit evidence of the 2016 incident was contingent on the victim's recantation and was specifically tied to the purpose of helping the jury to "weigh the reliability or credibility of the alleged victim." And, as the court observed, the prejudicial impact of the evidence was mitigated to an extent by the fact that the jury would necessarily know of the existence of the 2016 no-contact order and would likely surmise that the order arose from a prior incident. The trial court identified a legitimate basis for admitting the evidence and its decision was not an abuse of discretion.[5]

Fichtner also claims that the court's ruling allowed the State to impermissibly rely on the 2016 alleged assault to prove propensity and to suggest to the jury that victims of

---

[5] Because the court did not abuse its discretion admitting the evidence to assist the jury to evaluate Wachs's testimony, we need not address whether it was also admissible to show the absence of accident or mistake.

domestic violence "cannot be believed." We disagree. At trial, after Wachs blamed herself and her use of alcohol for her injuries, rather than Fichtner, the prosecutor raised the issue of the prior assault in probing her motivations for changing her account. The jury was entitled to consider information about the context of the relationship, including the prior assault, to evaluate Wachs's testimony retracting her prior statements to Schloss and law enforcement.

Wachs denied that Fichtner assaulted her in May 2016. She claimed she was also very drunk at that time, did not remember what happened, and said the violence was mutual or entirely on her part. The State asked Wachs if she remembered making specific statements to the police officer who responded to the 911 call in 2016. Overruling the defense's hearsay objection, Wachs responded that she did not remember. The State then presented the testimony of the police officer involved in that incident, who said that when he contacted Wachs, she was distraught, had visible injuries, and was uncooperative. The officer testified, without objection, that when he asked Wachs if she had been assaulted, she said only that her boyfriend was a "piece of shit, lazy, and likes to beat his women."

Fichtner claims that the trial court exceeded the scope of its prior ruling by admitting Wachs's 2016 statements which were general accusations of his abusive nature and not relevant beyond suggesting his propensity to assault women. But Fichtner did not object. When the court had earlier ruled that evidence about the 2016 domestic violence incident would be admissible in the event that Wachs recanted, the court expressly declined to decide what extrinsic evidence that would be admissible to impeach Wachs if she denied that the incident occurred. The court stated that, while

9

the State's presentation of extrinsic evidence would not be unlimited, it was "premature" to determine those limits before Wachs testified.

A party may not raise a claim of error not properly preserved at trial absent manifest constitutional error. State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). Fichtner fails to allege, much less establish, manifest constitutional error. The police officer's testimony did not violate a prior court ruling, since the court had reserved ruling on the issue. See State v. Powell, 126 Wn.2d 244, 257, 893 P.2d 615 (1995) (when the court makes a tentative ruling, "any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider."). We decline to review Fichtner's unpreserved assignment of error related to the admissibility of this testimony.

Admission of Prior Inconsistent Statement

Fichtner challenges the trial court's admission of the statement Wachs wrote on the night of the incident as substantive evidence under ER 801(d)(1)(i).

"Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Prior statements of testifying witnesses are considered hearsay unless they fall under an exclusion or exception to the hearsay rule. ER 801(d)(1).

Under ER 801(d)(1), a prior inconsistent statement is not hearsay and may be admitted as substantive evidence if: (i) the declarant testified at trial and was subject to cross-examination, (ii) the statement was inconsistent with the declarant's testimony, (iii) it was given under oath subject to penalty of perjury, and (iv) it was provided at a trial, hearing, or other proceeding, or in a deposition. An "other proceeding" under this rule may include statements made to investigating police officers. State v. Smith, 97

Wn.2d 856, 859-61, 651 P.2d 207 (1982); State v. Otton, 185 Wn.2d 673, 681-84, 374 P.3d 1108 (2016). Because a statement under ER 801(d) is not hearsay, it may be admitted "as substantive evidence, that is, to prove the truth of matter asserted in the statement." Otton, 185 Wn.2d at 679.

To determine whether a prior statement is admissible as substantive evidence under ER 801(d)(1)(i), courts must examine the specific facts under which the statement was given, with reliability as the key factor in determining admissibility. Smith, 97 Wn.2d at 861. In ascertaining a prior statement's reliability, we apply the following four-factor test:

> (1) whether the witness voluntarily made the statement; (2) whether there were minimal guaranties of truthfulness; (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause; and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement.

State v. Thach, 126 Wn. App. 297, 308, 106 P.3d 782 (2005), overruled on other grounds by State v. Case, 13 Wn. App. 2d 657, 466 P.3d 799 (2020); Otton, 185 Wn.2d at 680. We review the trial court's decision to admit or exclude such evidence for an abuse of discretion. State v. Ashley, 186 Wn.2d 32, 38-39, 375 P.3d 673 (2016).

Fichtner challenges only the second factor and claims that Wachs's statement bore insufficient guarantees of reliability. Minimal guaranties of truthfulness generally exist where the declarant provided the prior written statement under oath and under circumstances resembling a formalized proceeding. Smith, 97 Wn.2d at 862 (quoting 4 D. Louisell & C. Mueller, Federal Evidence 3-18 § 419, 169-71 (1980)). The requirements of ER 801(d)(1)(i) were met in Smith where the declarant wrote the statement in her own words and "the statement was attested to before a notary, under

11

oath and subject to penalty for perjury." Smith, 97 Wn.2d at 862. And in Thach, minimal guaranties of truthfulness were established where the declarant testified that she had signed her statement under penalty of perjury and an officer witnessed her sign the written statement form. Thach, 126 Wn. App. at 308.

In State v. Nelson, 74 Wn. App. 380, 389-90, 874 P.2d 170 (1994), we held that minimal guaranties of truthfulness were established where the declarant signed a written statement that included the following language, "I have read the attached statement or it has been read to me and I know the contents of the statement." Although the declarant did not write her own statement and was equivocal at trial as to whether she had read the affidavit incorporating the above language, there was other evidence in the record to suggest the declarant knew her statement was being taken under penalty of perjury. Nelson, 74 Wn. App. at 390.

Regarding the oath requirement of ER 801(d)(1)(i), RCW 9A.72.085 provides, in relevant part:

> Whenever, under any law of this state or under any rule, order, or requirement made under the law of this state, any matter in an official proceeding is required or permitted to be supported, evidenced, established, or proved by a person's sworn written statement, declaration, verification, certificate, oath, or affidavit, the matter may with like force and effect be supported, evidenced, established, or proved in the official proceeding by an unsworn written statement, declaration, verification, or certificate, which:
>
> (a)   Recites that it is certified or declared by the person to be true under penalty of perjury;
>
> (b)   Is subscribed by the person;
>
> (c)   States the date and place of its execution; and
>
> (d)   States that it is so certified or declared under the laws of the state of Washington.

12

Here, Wachs's written statement included the required components of RCW 9A.72.085 and, thus, the oath requirement was satisfied. See Nelson, 74 Wn. App. at 390. Preprinted language on the Snohomish County Sheriff's Office form stated: "I certify (or declare) under penalty of perjury, under the laws of the State of Washington that the entire statement is true and correct." Wachs checked the box preceding this warning, affixed her initials next to the language, and signed her full name on the line below it.

Wachs admitted that she wrote her own statement and signed it under penalty of perjury. There was no evidence to suggest that she did not read or did not understand the language of the form. The investigating police officer who provided the form testified that he told Wachs that providing a statement was voluntary, that she did not appear to have any difficulty filling out the form, and had no questions about it. Although the officer did not specifically testify that he explained or called Wachs's attention to the penalty of perjury language, there was sufficient evidence from which the trial court could find that she understood the statement to be made under penalty of perjury. While Fichtner points to Wachs's testimony that she was extremely intoxicated, as indicated by her "horrible" handwriting on the form, Deputy James and Schloss testified differently about her condition and the trial court observed that her handwriting on the form was "actually fairly clear." We do not evaluate the credibility of witnesses. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

The facts are materially different from those in State v. Nieto, 119 Wn. App. 157, 162-63, 79 P.3d 473 (2003). Nieto involved a minor declarant. Neito, 119 Wn. App. at 160. And due to the wording and placement, the boilerplate "penalty of perjury"

13

language was ambiguous and did not comply with RCW 9A.72.085. Nieto, 119 Wn. App. at 161-62. Because of this ambiguity, the entire statement was not under oath. Nieto, 119 Wn. App. at 162.

The language of Wachs's statement was not ambiguous. Because there were minimal guarantees of its truthfulness, the trial court did not abuse its discretion by admitting the written statement as substantive evidence under ER 801(d)(1)(i).

Calling Witness for Sole Purpose of Impeachment

Fichtner argues that the trial court erred by allowing the State to call Wachs as a witness because there was no independent relevance to her testimony beyond its use as a means to present the otherwise inadmissible evidence of the 2016 alleged assault.

Although the State may impeach its own witness, it may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible. State v. Lavaris, 106 Wn.2d 340, 346, 721 P.2d 515 (1986). The underlying concern is that the State may call a witness knowing that the witness will not provide useful evidence for the purpose of introducing hearsay evidence against the defendant. State v. Hancock, 109 Wn.2d 760, 763, 748 P.2d 611 (1988). "This tactic seeks to exploit a jury's difficulty in making the subtle distinction between impeachment evidence and substantive evidence." Hancock, 109 Wn.2d at 763.

The record does not support the claim that the primary purpose of Wachs's testimony was to allow the State to elicit otherwise inadmissible testimony about the 2016 assault. Wachs's testimony corroborated elements essential to the State's case about the no-contact order and violation of that order. And, as explained, her written

police statement constituted substantive evidence that Fichtner violated the order by committing assault. Her testimony was necessary to provide the foundation for that evidence.

<u>Prosecutorial Misconduct</u>

Finally, Fichtner claims that some of prosecutor's remarks during closing argument were improper and deprived him of a fair trial.

To prevail on a claim of prosecutorial misconduct, a defendant must establish that conduct was both improper and prejudicial in the context of the entire case. <u>Magers</u>, 164 Wn.2d at 191. Where, as here, the defendant fails to object at trial, the error is waived absent misconduct so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. <u>State v. Emery</u>, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

We review statements in a prosecutor's closing arguments in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions. <u>State v. Boehning</u>, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). A prosecutor has wide latitude to draw reasonable inferences from the evidence during closing argument, but may not make statements that are unsupported by the evidence and prejudicial to the defendant. <u>Boehning</u>, 127 Wn. App. at 519.

In closing argument, the prosecutor addressed irreconcilable differences between Wachs's statements on the night of the crime and her testimony:

> Now, it is no mystery or surprise after you have heard all the evidence that there has been a change of story from Ms. Wachs. At first glance it might be confusing. Why would a victim of an assault change her story? But you have to remember that this is not an assault between strangers. This is an assault between a domestic relationship. And as you also may recall during jury selection, there are certain factors that are specific in an

> intimate partner relationship such as embarrassment, shame, feelings of guilt, emotional attachment to the defendant, financial support. These [are] motivating factors that might lead someone to change their story. Because in an assault situation between strangers, victims of this type of assault are seeking justice and vindication of what happened to them. The victims of domestic violence are not necessarily trying to get the other person prosecuted. And as you may recall, Ms. Wachs testified herself: I am just trying to tell a story so that he doesn't go to prison.

Fichtner contends that, in making this argument, the prosecutor improperly relied on facts not in evidence regarding Wachs's possible motives; mischaracterized the evidence by suggesting that Wachs admitted to lying on the witness stand to protect the defendant; and improperly "vouched" for Wachs's "lack of credibility". Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or bases an argument about credibility on evidence not presented at trial. State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

Considering the prosecutor's statement in the context of the entire argument, the prosecutor did not state a personal belief or encourage the jury to base its verdict on matters outside of the record. In examining Wachs, both the State and the defense explored Wachs's motivation to alter her account of the incident and the State suggested that she was influenced by factors related to her relationship with Fichtner. Although the prosecutor referred to discussions during voir dire about domestic violence in general, the argument about Wachs's motivation was drawn from the evidence. The prosecutor was entitled to argue reasonable inferences from the evidence that were consistent with the State's theory of the case. The prosecutor did not mischaracterize the evidence by calling the jury's attention to Wachs's admission that she did not want the September 2017 incident to result in criminal consequences. Defense counsel's failure to object to the comments also "strongly suggests" that they "did not appear

16

critically prejudicial to [the defendant] in the context of the trial." State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

To the extent the prosecutor suggested that Wachs's trial testimony was less persuasive than other evidence contradicting her testimony, such arguments were not improper. The State made no arguments that were unsupported by facts in the record. Fichtner fails to establish improper conduct or prejudice.

Affirmed.

_Mann, C.J._

WE CONCUR:

17